SOUTHERN RY. CO. et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).

(Commerce Court. March 11, 1913.)

No. 82.

1. COMMERCE (§ 85*)—INTERSTATE COMMERCE ACT—DISCRIMINATION BETWEEN LOCALITIES—FINDING OF INTERSTATE COMMERCE COMMISSION.

Section 15 of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1911, p. 1297) confers on the Interstate Commerce Commission ample power, in a hearing under section 13, to determine whether rates put in force by carriers are unjustly discriminatory as between two cities, to extend the scope of its examination far enough to arrive at the true situation with respect to all matters which properly tend to show whether or not, under section 3, undue preference or advantage is given to one city over the other; and its determination of the question of fact, when supported by any substantial evidence proper to be considered, is not reviewable by the courts.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.*]

2. COMMERCE (§ 85*)—INTERSTATE COMMERCE ACT—DISCRIMINATION IN RATES —JURISDICTION OF COMMISSION.

Petitioners, railroad companies with lines extending from Norfolk, Va., into what is known as the Southeastern territory, lying east of the Chattanooga-Birmingham line, are engaged in carrying traffic between Norfolk and points in such territory, and also between such points and Newport News, although they do not reach such place with their rails, but by connection with the line of another company from Richmond, or by water lines, owned by the latter company and by one of petitioners, from Norfolk, 12 miles across Hampton Roads. They have established through routes and joint rates on the Newport News business, which rates exceed the Norfolk rates to the extent of the charges, rates, or divisions of rates exacted and received by the carriers directly serving Newport News. For a period they maintained the same rates to and from Newport News as to and from Norfolk, and such rates are still in force as to certain commodities, and on export and import traffic, and on traffic to or originating in the territory west of the Chattanooga-Birmingham line. *Held*, that a finding by the Interstate Commerce Commission that the rates established by petitioners were unjustly discriminatory against Newport News, and an order requiring them to make the same rates between that place and all points in the Southeastern territory more than 150 miles distant as between Norfolk and such points, were within its jurisdiction, and not reviewable by the courts.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.*]

Suit by the Southern Railway Company, the Atlantic Coast Line Railroad Company, the Seaboard Air Line Railway, the Norfolk & Western Railway Company, and the Norfolk Southern Railroad Company, as petitioners, against the United States, as respondent, and the Interstate Commerce Commission and the Chamber of Commerce of Newport News, as interveners. Decree for respondents.

R. Walton Moore, Frank W. Gwathmey, and M. Carter Hall, all of Washington, D. C., and W. B. Rodman, of Norfolk, Va., for petitioners.

Blackburn Esterline, Sp. Asst. Atty. Gen. (Thurlow M. Gordon, Sp. Asst. Atty. Gen., on the brief), for the United States.

Charles W. Needham, of Washington, D. C., for Interstate Commerce Commission.

R. G. Bickford, S. O. Bland, and Charles C. Berkeley, all of Newport News, Va., for Chamber of Commerce of Newport News.

Before KNAPP, Presiding Judge, and HUNT, CARLAND, and MACK, Associate Judges.

HUNT, Judge. In 1911, the Chamber of Commerce of Newport News, Va., instituted a proceeding before the Interstate Commerce Commission against these petitioners, the Southern Railway Company, Atlantic Coast Line Railroad Company, Seaboard Air Line Railway, Norfolk & Western Railway Company, Norfolk Southern Railroad Company, and other carriers, including the Chesapeake & Ohio Railway Company, which are not petitioners herein, for the purpose of requiring the establishment and observance of the same rates on all traffic between Newport News and points in the territory hereinafter described as between Norfolk and such points, upon the ground that the higher Newport News rates then in force were an undue discrimination against that city and the business interests thereof. After full hearing the Commission sustained this contention (Chamber of Commerce of Newport News v. Southern Railway Company et al., 23 Interst. Com. Com'n. R. 345), and by order made June 7, 1912, directed the defendant carriers to cease and desist on or before October 1, 1912, and for a period of not less than two years thereafter to abstain from charging or collecting higher rates for the transportation of freight from all points on their respective lines, not within 150 miles of Norfolk, in the territory east of a line drawn from Chattanooga, Tenn., than are contemporaneously charged for the transportation of freight from the same points in the described territory to Norfolk, Va., and also requiring said carriers to desist from charging or collecting higher rates for the transportation of freight from Newport News to all points on their respective lines in the territory, not within 150 miles of Norfolk, east of a line drawn from Chattanooga, Tenn., as hereinbefore described, than are contemporaneously maintained from Norfolk, Va., to the same points, and also requiring said carriers on or before October 1, 1912, to establish and maintain, for a period of not less than two years, rates for the transportation of freight from Newport News, Va., to all points on their respective lines, except those within 150 miles of Norfolk, in the territory east of a line drawn from Chattanooga southward, as heretofore referred to, which rates should not be higher than rates which they contemporaneously maintained for the transportation of freight from Norfolk, Va., to the same points, and also requiring said carriers to establish and maintain for a period of not less than two years, rates for the transportation of

freight from all points on their respective lines in the territory, not within 150 miles of Norfolk, east of a line drawn from Chattanooga, Tenn., southward, as already described, known as the Chattanooga-Birmingham line, to Newport News, Va., which should not be higher than rates for the transportation of freight contemporaneously maintained by them from the same points to Norfolk, Va. By a supplemental order of the Commission, the order of June 7, 1912, was amended so as not to be effective until October 20, 1912.

To annul the order of June 7th, petitioners brought this suit. Answers were filed by the United States and the Commission. Petitioners filed affidavits and moved for a temporary restraining order. This was denied. Thereafter counsel for all parties filed a stipulation to the effect that certain copies (annexed to the stipulation) of the individual freight tariffs of the Southern Railway Company and the Norfolk & Western Railway Company showed the existing construction of rates and charges made by such carriers upon domestic and foreign freight originating and billed by them from the Southeastern territory to Newport News, Va., and from Newport News to points in the Southeastern territory, and that such tariffs were concurred in by the Atlantic Coast Line, Seaboard Air Line, and Norfolk Southern Railway Companies as intermediate carriers. The stipulation also included a copy of the individual tariff of the Chesapeake & Ohio Railway Company, showing the rates and charges in force charged by it upon domestic and foreign freight between Newport News and the Southeastern territory, and that upon all domestic and foreign freight originating at points in and billed from the Southeastern territory by the Atlantic Coast, Seaboard Air Line, and Norfolk Southern there is charged the combination of the Virginia cities rates and the arbitraries on such freight charged by the Chesapeake & Ohio. Upon the pleadings and the stipulation just referred to the case has been submitted. A correct understanding of the situation calls for statement of the substance of the pleadings:

Petitioners aver that the Southern Railway Company, Seaboard Air Line Railway, Norfolk & Western Railway Company, and Norfolk Southern, with lines of railroad extending from Norfolk into the territory heretofore described, have been and are engaged in the transportation of interstate traffic between Norfolk and points in the territory referred to in the order of the Commission, and that with various other connecting common carriers they have participated and are now participating in the transportation of traffic between Newport News and the said territory, in connection with the Chesapeake & Ohio Railway Company, serving Newport News either by rail from Richmond or by water from Norfolk; the through transportation charges between Newport News and points in the Southeastern territory being in excess of the through transportation charges between Norfolk and points in said territory, to the extent of the charges, rates, or divisions of rates exacted and received by the carriers directly serving Newport News. Petitioners set up that the evidence before the Commission showed that the rates carried by petitioners to and from Norfolk were and are compelled by competitive circumstances and conditions beyond

petitioners'. control, existing at Norfolk and not at Newport News, and that the Commission had no power to compel application by petitioners of the Norfolk rates to or from Newport News and the territory defined, or to prescribe the Norfolk rates.

Petitioners also plead that the traffic moving between Newport News and this Southeastern territory is handled by the Chesapeake & Ohio between Newport News and Richmond, which is the place of interchange by that company with the Southern Railway Company, Atlantic Coast Line Railroad Company, Norfolk & Western Railway Company, and Seaboard Air Line Railway, or by barges of the Chesapeake & Ohio Railway Company between Newport News and Norfolk. The Chesapeake & Ohio does not enter Norfolk with its rails. Petitioners say that to give to Newport News the same rates of transportation on traffic between Newport News and the territory described, as between Norfolk and said territory, would necessitate a division of rates with the Chesapeake & Ohio on the all-rail traffic, and on traffic moving across Hampton Roads either a similar division of revenue with water carriers or the establishment and maintenance of a barge service at great expense to petitioners, and that the effect would be to compel these petitioners, whose rails do not reach Newport News, on traffic between Newport News and points on petitioners' lines in the territory described, either to allow the Chesapeake & Ohio its charges to and from Newport News and points on petitioners' lines in said territory, and thus sacrifice petitioners' revenues and compel them to absorb the charges of the lines reaching Newport News, or themselves to establish and maintain facilities for transporting such traffic from Norfolk to Newport News, in order to make delivery there.

Petitioners admit that for a certain period they participated in rates to and from Newport·News not higher than the Norfolk rates, but say that any such former adjustment cannot be made the foundation for the order of the Commission in the premises. It is alleged that the Commission has undertaken to hold petitioners severally responsible for transportation charges between Newport News and points in the defined territory, when the petitioners do not reach or serve Newport News with their own rails or facilities, and cannot and do not control the total transportation charges, and that the order deprives petitioners of their constitutional rights.

The Commission denies that the facilities of petitioners do not reach or serve Newport News, and alleges that the petitioners are now participating in the transportation of traffic between Newport News and the Southeastern territory in connection with the Chesapeake & Ohio Railway Company to Newport News, either by rail from Richmond or by water from Norfolk. The answer avers that in December, 1894, the petitioners, by resolution of an association of railroads with which petitioners were associated, gave to Newport News the same rates from and to what is known as the Southeastern territory as were and are given to Norfolk, and that until August 1, 1899, all the petitioners by their lines served shippers to and from Newport· News upon precisely the same rates that were charged to

shippers to and from Norfolk; that after August 1, 1899, these petitioners. refused longer to give to the shippers to and from Newport News the same rates as to shippers to and from Norfolk, and since then have charged shippers on all through business from or to the said Southeastern territory, except pig iron and lumber and export and import traffic, rates based on differentials from Norfolk. The Commission denies that compliance with the order means that petitioners will have to reduce their rates or furnish additional water equipment required to make deliveries at Newport News, for the reason that the order of the Commission only requires the removal of the undue discrimination found by the Commission to exist against Newport News, and in favor of Norfolk, without specifying how such discrimination shall be removed. It is denied that as an incident to the removal of the discrimination shippers at Newport News would have any advantage by way of switching charges or otherwise over Norfolk shippers; and the Commission alleges that these petitioners, and each of them, hold themselves out to receive freight, and do receive freight, from points in the Southeastern territory destined to Newport News; that the traffic is billed through by petitioners from points of origin to Newport News, and a through rate is charged and collected therefor; that they pursue a like course with respect to freight originating at Newport News for points in the Southeastern territory; that they receive traffic originating at points in said territory for points in foreign countries billed and transported from the lines of petitioners and their connections via Newport News, and pursue a like course with respect to traffic originating in foreign countries and received at Newport News and destined to points in the Southeastern territory; that a considerable portion of the through traffic, such as has just been described, is transported over the lines of the petitioners through Norfolk to Newport News, and from Newport News through Norfolk to points in the Southeastern territory. All allegations of excess of authority or illegal action in the premises are denied.

The United States, in its answer, alleges that the Southern Railway Company reaches Newport News with its own floating equipment, and the Norfolk & Western reaches Newport News by means of the floating equipment of the Southern Railway Company, and that petitioners have through routes and joint rates and through billings to Newport News with the Chesapeake & Ohio. It sets up that the lines of the Chesapeake & Ohio, and those of two other companies not parties hereto, the Norfolk & Portsmouth Belt Line Railroad Company and the New York, Philadelphia & Norfolk Railroad Company, do not extend to the Southeastern territory, but that the Chesapeake & Ohio and the other companies just last mentioned have through routes, joint rates, and through billings with the petitioners; that the Chesapeake & Ohio is ready to transport and deliver freight to Newport News on such through routes and joint rates and through billings at the Norfolk rates, and to accept fair and reasonable divisions of the through rates. It is alleged that the cities of Norfolk and Newport News sustain intimate commercial relations with the

South, and depend upon the South for materials used in the manufactories and markets of the two places; that the Southern Railway Company delivers import and export traffic at Newport News either by its own floating equipment or by the Chesapeake & Ohio; that the Atlantic Coast Line and Seaboard Air Line use for such service the floating equipment of the Chesapeake & Ohio; that the Norfolk & Western uses for such purpose the floating equipment of the Southern; that as to all territory west of the Chattanooga-Birmingham line petitioners have kept Newport News and Norfolk on the same basis; that east of the Chattanooga-Birmingham line petitioners, in maintaining Newport News on the same basis as Norfolk, would not be obliged to handle the traffic in any manner different from that now used in handling the traffic originating west of the line; and that in maintaining Newport News on the same basis as Norfolk, on traffic originating east of said line, the differentials to be absorbed by the petitioners would be less than the differentials now absorbed by them on traffic originating west of said line. All allegations to the effect that the rates made by the petitioners to and from Norfolk were compelled by competition such as does not exist at Newport News are denied. Referring to the previous increase of the Newport News rates, the United States avers that they grew solely out of differences of the petitioners with the Chesapeake & Ohio relating to divisions of the through rates, but that the Chesapeake & Ohio is now ready to receive, transport, and deliver freight to Newport News on through routes, joint rates, and through billings, and to accept fair and reasonable divisions of the through rates, and restore the previous adjustment, but that petitioners decline to do so.

The report of the Commission, upon which the order under examination is made, is quite elaborate in its explanation of the situation of Newport News and Norfolk, and among other things sets forth these facts: That the Chesapeake & Ohio is the only railroad the tracks of which reach Newport News, and that it there maintains float bridges, wharves, piers, and other terminal facilities; that Norfolk is separated from Newport News by 12 miles of water; that the Norfolk & Western road reaches Norfolk by rail; that the Norfolk & Southern has a terminal at Berkley, which is a part of the city of Norfolk; that the Southern and Atlantic Coast Line, respectively, have terminals on the west side of the Elizabeth river, near Norfolk; that the Seaboard Air Line has a terminal at Portsmouth, on the west side of the Elizabeth river, near Norfolk; that the New York, Philadelphia & Norfolk Railroad, which is not a party to this proceeding, maintains tracks extending from connections with the Southern and Coast Line to Port Norfolk on the west side of the Elizabeth river, where it has complete terminal facilities; that the Norfolk & Portsmouth Belt Line Railroad maintains track connections with the other lines except the Chesapeake & Ohio; that at Port Norfolk and Portsmouth, on the west side of the Elizabeth river, at Norfolk itself, at Lambert's Point, on the east side of the river, and at Berkley, on the west side of the eastern branch of the river, there are piers, float

bridges, wharves, and warehouses belonging to the several railroad companies, which appeared as defendants before the Commission, among which were the petitioners herein. It appears that the Chesapeake & Ohio has a terminal in Norfolk, and maintains piers, a float bridge, yards, and warehouses.

The Commission explains how the interchange of traffic between certain of the companies is effected, that is, by means of the short line tracks of the New York, Philadelphia & Norfolk, or by the Belt Line, or both, or by the floating equipment owned and operated by certain of the railroad companies, and also by drayage service; that the Southern receives and delivers import and export traffic at Newport News, either by means of its own floating equipment or that of the Chesapeake & Ohio; that the Coast Line and Seaboard Line use the floating equipment of the Chesapeake & Ohio, and that the Norfolk & Western uses the floating equipment of the Southern. It was found that both Newport News and Norfolk sustain intimate commercial relations with the South, that both are dependent largely upon the South, and particularly upon the Associated Railways territory and Southeastern Freight Association territory, which sections are found to embrace all the territory east of a line drawn from Chattanooga, Tenn., southward, through, but not including, Birmingham, Selma, and Montgomery, Ala., to Pensacola, Fla., known as the Chattanooga-Birmingham line. These last-named places are reached by the rails of the Southern, Coast Line, Seaboard, Norfolk & Southern, and their connections, and in part by the Norfolk & Western and its connections. The Commission then details an arrangement entered into between the Chesapeake & Ohio, the Southern, the Coast Line, the Seaboard, and their connections, by which for a number of years Newport News had the same rates as Norfolk to all common points in each of the Association territories. Joint rates were maintained until July 31, 1899, and rates to and from local stations on the Southern are shown to have continued until July 28, 1900. Because of some dispute between the carriers which are parties to the joint rates as to divisions allowed the Chesapeake & Ohio on traffic to and from points east of the Chattanooga-Birmingham line, the Southern carriers withdrew from the arrangement, and thereafter the joint rates, except on import and export traffic, were canceled as to all common points in the Association territories.

It is pointed out that, while through routes have remained open substantially as before via both Norfolk and Richmond, the rates to and from Newport News have been maintained on a basis of differentials over Norfolk on a scale of 15 cents for 100 pounds first class, down to 4 cents class D, and that commodity rates have obtained on substantially the same basis. It is found that the Chesapeake & Ohio was dissatisfied merely with the divisions it received, but that that road now assumes an attitude whereby it would give to Newport News the same rates as Norfolk to and from the South, but that the Southern lines have not been willing to reduce their rates in order to place Newport News on the Norfolk rate basis. It is shown that in the territory west of the Chattanooga-Birmingham line, reached by the South-

ern carriers and their connections and by the Chesapeake & Ohio and its connections, the rates to and from Newport News have continued the same as rates to and from Norfolk, and that on Newport News traffic to or from points west of the Chattanooga-Birmingham line, which usually moves via Richmond, the divisions of the joint rates received by the Chesapeake & Ohio are measured by a scale of 26 cents per 100 pounds first class, down to 8 cents, with divisions of commodity rates on relatively the same basis. On certain classes of traffic the Commission finds that the Newport News rates remained the same as Norfolk rates after July 31, 1899. This is true of pig iron from certain points in Tennessee and from iron-producing sections of Georgia and Alabama, and on lumber from various points in Alabama.

Deliveries to Newport News are found to be by floating equipment of the carrier handling the traffic or the equipment of the Chesapeake & Ohio, if it moves via Norfolk, Portsmouth, or Pinner's Point, or via the Chesapeake & Ohio rails, if the traffic moves through Richmond. It is shown by the Commission that between Baltimore and various important points in the Association territories the Southern lines and their connections maintain lower rates than to and from Newport News. An explanation is made of what is known as Virginia cities rates; that is, rates to certain points in Virginia, made because of competitive conditions existing at those points. The Commission then considers the question of Virginia cities rates to Newport News, and finds that there is no competition to compel the Southern lines to maintain Virginia cities rates from Roanoke to points beyond the terminus of the Carolina extension of the Norfolk & Western, and that the argument made by the Southern carriers before the Commission for not giving Virginia cities rates to Newport News was not persuasive. Explicit finding is made that Newport News is placed in a position of material disadvantage as compared to Norfolk. Consideration is given to whether such disadvantage is the result of unjust discrimination or undue or unreasonable prejudice, due to the rate adjustment.

In analyzing the situation, the Commission considers natural advantages, the relative merits of the harbors, and the dependencies of the two cities upon the South for the materials used in their manufactories, and for markets for their manufactured products. Regard is had to the fact that, while none of the rails of the Southern, Coast Line, Seaboard, and Norfolk & Western actually reach Newport News, nevertheless each of these companies serves Newport News, carrying to and from the South by way of Norfolk or through connections with the Chesapeake & Ohio at Richmond. The Commission says that the Southern carriers practically control the rates between Newport News and points within Association territories. Reference is made to the accepted fact that the rates between Newport News and points west of the Chattanooga-Birmingham line are influenced by competition induced by the Chesapeake & Ohio and its connections, the lines of which penetrate their territory, and it is found that this accounts for the equal rates between those points and Newport News and Norfolk, as the Chesapeake & Ohio reaches both cities either by all rail or by rail and water. But as to the Western situation, the Commission was

of the opinion that the rate was the material matter, and not the reasons which induced it. Reference is also had by the Commission to the equal rates given on pig iron from points in Tennessee, Alabama, and Georgia, east of the Chattanooga-Birmingham line.

While the fact that there is equality of rates on exports and imports is adverted to by the Commission, emphasis is laid on the contention of the Newport News Chamber of Commerce, not that there was any discrimination in the export or import rates, as compared with the domestic rates from Newport News, but rather that the Southern lines, by engaging in import and export business via Newport News, have made themselves common carriers as to that point, and thereby assume an obligation to transport domestic traffic also, and to maintain the necessary equipment for that purpose. After discussing the competition of certain lines of steamers between Baltimore and various Southern cities which affects rail and water rates between Baltimore and various Southern points, it is held that in view of all the considerations stated by it, the situation at Newport News is not the result of competition or other conditions beyond the control of the carriers then before it, and that upon the record the former rate adjustments were shown to have been set aside solely because of the disagreement had with the Chesapeake & Ohio. It is also noted that through routes exist by which traffic is transported under through bills of lading between Newport News and the South, and it is held that joint rates should be established by way of such through routes between Newport News and all common points outside of Virginia in Associated Railways and Southeastern Freight Association territories, and that such joint rates as to points not within 150 miles of Norfolk should not exceed the rates contemporaneously applied by these petitioning carriers between Norfolk and the same points.

[1] Petitioners cannot avoid the force and effect of these findings of the Commission. It was for that body to hear and ascertain what the actual conditions are, and whether rates or charges demanded or collected by the petitioning carriers for the transportation of freight are unjustly discriminatory or unduly preferential or prejudicial in favor of Norfolk as against Newport News, and to make an order that the carrier or carriers should desist from any violation found. Under the provisions of section 15 of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), ample power is vested in the Commission in a proceeding before it to extend the scope of its examination far enough to arrive at the true situation with respect to all matters which properly tend to show whether or not under section 3 undue preference or advantage is given to one city over the other. Involved in such an investigation appears to be inquiry into just such facts and circumstances as were adverted to by the Commission herein, namely, relative location, method of service, how interchange is made, whether rates are joint, whether both foreign and domestic business are affected, the relation of rates charged to other rates, whether or not there is competition of rail and water, natural advantages, markets for traffic, and the welfare of the

communities affected. Presumably the evidence which was introduced bearing upon these points was competent and relevant to the issues of the pleadings.

These are the matters, whether actual or circumstantial, from which were drawn the inference that as a fact there was a disadvantage to Newport News, and that that city was unjustly discriminated against. The Commission may have so far carried its inquiry as to have considered, among other things, evidence of rates into territory not so closely related to that directly involved as to have material bearing, or it may have given great weight to evidence introduced to show competition that affected rates, and little to that which showed the relative volume of traffic in and out of the two cities affected, or it may have failed to correlate well the evidence of natural advantage with that of rates; but inasmuch as it did have before it substantial evidence proper to be looked at which supported the allegations of the complaint made by the Newport News Chamber of Commerce, together with such evidence as these petitioners as defendants in the proceeding referred to cared to introduce upon the issue of discrimination, which was the only issue presented, it is not for the courts to disturb the ultimate judgment of the Commission by saying that under the evidence there was no unjust disadvantage to Newport News. Interstate Commerce Commission v. Union Pacific R. R. Co. et al., 222 U. S. 541, 32 Sup. Ct. 108, 56 L. Ed. 308. The Supreme Court, in Texas & Pacific Railway v. Interstate Commerce Commission, 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940, after reviewing the English case of Denaby Main Colliery Company v. Manchester, etc., Railway Company, 3 Railway & Canal Traffic Cases, 426, from which Justice Shiras quotes quite fully, states its own conclusions as to the act to regulate commerce as follows:

" * * * That, in passing upon questions arising under the act, the tribunal appointed to enforce its provisions, whether the Commission or the courts, is empowered to consider fully all the circumstances and conditions that reasonably apply to the situation, and that, in the exercise of its jurisdiction, the tribunal may and should consider the legitimate interests as well of the carrying companies as of the traders and shippers, and in considering whether any particular locality is subjected to an undue preference or disadvantage the welfare of the communities occupying the localities where the goods are delivered is to be considered as well as that of the communities which are in the locality of the place of shipment; that among the circumstances and conditions to be considered, as well in the case of traffic originating in foreign ports as in the case of traffic originating within the limits of the United States, competition that affects rates should be considered, and, in deciding whether rates and charges made at a low rate to secure foreign freights which would otherwise go by other competitive routes are or are not undue and unjust, the fair interests of the carrier companies and the welfare of the community which is to receive and consume the commodities are to be considered."

[2] The petitioners urge that section 3 of the act is not applicable to an instance where a common destination is served from two different points of origin by carriers wholly independent of each other in the sense that each carrier has its own rails from the point of origin which it serves to the destination, and that this section is inapplicable

where a common destination is served from two different points of origin by carriers wholly independent of each other in the sense that between the destination and one of the points of origin one of the carriers alone operates, while between the destination and the other point of origin the two carriers operate in connection with each other. These propositions are contended for upon the principle stated by Justice Jackson in Interstate Commerce Commission v. Baltimore & Ohio Railroad Company (C. C.) 43 Fed. 37, that:

"Subject to the two leading prohibitions that their charges shall not be unjust and unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or advantage, or subject to undue preference or disadvantage, persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are recognized as sound and adopted in other trades and pursuits."

It is argued that, if the order of the Commission stands, it means unwarranted interference with the management of the business of the carriers, shrinking of revenues to one point served in order to allow another point not served to have a scale of rates lower than it otherwise would have, and responsibility upon a carrier, not alone for the rates to a point which it serves, but also for rates to another point to which it owes no duty. The necessary predicate for these suggestions is that each of the carriers situated as are these petitioners is to be regarded as independent of the line of the Chesapeake & Ohio operating from Newport News via Richmond to the same destination in connection with the same Norfolk carriers, that the Richmond rate is the same as the Norfolk rate and is reasonable, and that inasmuch as the rates from Newport News are reasonable, and not assailed as unreasonable, to give Newport News the same rates as Norfolk would give to that city rates it cannot lawfully ask.

It may be that, where a common destination is served from two different points of origin by carriers wholly independent of each other in the sense stated by petitioners, section 3 is inapplicable. Tozer v. United States (C. C.) 52 Fed. 917, is cited by petitioners as holding to this view. That case, however, involved a criminal charge under section 3, based upon a mere disparity existing between a local and a joint through rate. But we need not decide that exact question, because we have here charges, not simply of a disparity between a local and a joint rate, but of acts of discrimination against Newport News, where there have been rates made by petitioners from the territory hereinbefore referred to to Newport News, and where freight is carried under through bills of lading from the territory described to Newport News. It is thus that a situation has arisen wherein Newport News is served by way of Norfolk or through connection with the Chesapeake & Ohio at Richmond, which makes a case calling for the exertion of the power of the Commission to ascertain whether the discrimination created was due or undue as comprehended by section 3 of the act.

That the rails of the petitioners do not go to Newport News is not important. All actually serve Newport News. And although it would appear as if the Commission approved of the contention made before it by the representatives of Newport News, that inasmuch as these petitioners by engaging in the export and import business via Newport News made themselves common carriers generally as to that point, and thereby assumed obligations to transport domestic traffic also, still as it was of record before the Commission and is before us that these petitioners as shown by their tariffs engage in domestic as well as export and import traffic to Newport News via Norfolk, we may resolve the questions involved, holding that under the evidence of the service offered to be performed, the conclusion of the Commission that there was unjust discrimination against Newport News was justified and involved no excess of power.

It is not of moment to this inquiry that Norfolk shippers may have to pay switching charges on traffic originating or destined to that point, while Newport News shippers may not. If that should be the case, it would not necessarily constitute ground for annulling the order of the Commission. The order does not direct the carriers to carry to Newport News for less rates than they carry to Norfolk, but does require that within the territory described they shall desist from charging more for transportation on their respective lines from and to Newport News than they contemporaneously charge from and to Norfolk. This was responsive to the issues before the Commission, and cannot be disturbed by the courts.

Decree for respondents.