TEXAS & PACIFIC RAILWAY CO. et al. *v.* UNITED STATES et al.

No. 1. Argued October 12, 13, 1931.—Reargued October 11, 12, 1932.—Decided May 29, 1933.

628

Mr. *T. J. Freeman*, with whom *Messrs. T. D. Gresham, Esmond Phelps* and *Robert L. W. Thompson* were on the brief, for the Texas & Pacific Ry. Co. et al., appellants, on the original argument. *Mr. Charles M. Spence*, with whom *Messrs. T. J. Freeman, T. D. Gresham, Esmond Phelps, A. L. Burford, R. E. Milling, Jr.*, and *Robert L. W. Thompson* were on the brief, for the Texas & Pacific Ry. Co., on reargument.

Mr. *Luther M. Walter*, with whom *Messrs. John S. Burchmore* and *Nuel D. Belnap* were on the brief, for the New Orleans Joint Traffic Bureau et al., appellants.

Mr. *Wylie M. Barrow*, Special Assistant to the Attorney General of Louisiana, with whom *Mr. Percy Saint*, Attorney General, was on the brief, for the State of Louisiana, intervener-appellant, on the original argument. *Mr. Barrow* also reargued the cause, and with *Mr. Gaston L. Porterie*, the then Attorney General of Louisiana, filed a brief on behalf of the State.

Mr. *Edward R. Schowalter* filed a brief on behalf of the Louisiana Public Service Commission, intervener-appellant.

*Mr. John St. Paul, Jr.,* with whom *Messrs. Wm. C. Dufour* and *Leonard B. Levy* were on the brief, for the Board of Commissioners of the Port of New Orleans, intervener-appellant.

*Mr. Daniel W. Knowlton,* with whom *Solicitor General Thacher* and *Assistant to the Attorney General O'Brian,* were on the brief, for the United States and Interstate Commerce Commission, appellees.

*Mr. R. S. Outlaw,* with whom *Messrs. C. S. Burg, Fred L. Wallace, G. B. Ross, E. E. McInnis,* and *Joseph M. Bryson* were on the brief, for the Missouri-Kansas-Texas R. Co. et al., appellees.

*Mr. R. C. Fulbright,* with whom *Messrs. James V. Allred,* Attorney General of Texas, *Elbert Hooper,* Assistant Attorney General, *Mart Royston, Fred N. Oliver,* and *John C. White* were on the brief, for the Galveston Chamber of Commerce and the State of Texas et al., intervener-appellees.

By leave of Court, *Messrs. Samuel Silverman* and *A. Henry Walter* filed a brief on behalf of the City and Port of Boston, as *amici curiae.*

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The Galveston Commercial Association complained to the Interstate Commerce Commission that carload commodity rates on import, export and coastwise traffic between a portion of western classification territory and Galveston were unreasonable, and their relationship with those to and from Houston, Texas City, Beaumont, Port Arthur, and Orange, Texas, and New Orleans, La., was unduly prejudical to Galveston.[1] The claim of unreason-

---

[1] The complaint also attacked rates to and from a portion of the State of Illinois and the port of Mobile, Ala. The Commission, how-

ableness was abandoned as was also the assertion of discrimination in favor of the other Texas ports. The latter intervened and prayed the same relief as might be accorded Galveston in respect of rate relationship with New Orleans. The issue was therefore narrowed to one of prejudice to them and preference of New Orleans. Railroads serving the Texas ports and various shippers and commercial bodies intervened in support of the complaint; interests connected with the port of New Orleans and shippers intervened in opposition.

The Commission found that export and import rates on fourteen commodities from or to points in Arkansas, Texas, Oklahoma, southern Kansas, and Louisiana west of the Mississippi River, were unduly prejudicial to Galveston, and unduly preferential of New Orleans. In all instances where the distance to Galveston is less than the distance to New Orleans by not over one hundred miles it permitted equal rates; but for differences in distance exceeding one hundred miles it prescribed certain named minimum differentials in favor of Galveston.[2]

On rehearing the prior decision was modified by including the other Texas ports with Galveston in the finding of undue prejudice; substituting a twenty-five per cent. difference in distance for the 100-mile basis; exempting from the scope of the order rates to or from points on the Texas & Pacific and the Louisiana Railroad & Navigation Company;[3] exempting rates on petroleum

---

ever, did not deal with these, and the averments of the complaint in this respect are immaterial to the decision of the case.

[2] 100 I.C.C. 110.

[3] The Louisiana Railroad & Navigation Company was at the time of the earlier hearings operated under a single ownership with the Louisiana Railway and Navigation Company of Texas; and the two are referred to by the Commission as the L. R. & N. System. Prior to the institution of suit in the court below both lines were acquired by the Louisiana & Arkansas Railway Company. The latter joined with the other two as plaintiffs in the District Court. In the opinion the System will for convenience be called the L. R. & N.

and its products; and making certain other changes not here material.[4]

The proceeding was later reopened for the purpose of deciding whether the Texas & Pacific and the L. R. & N. should continue to be exempted. The Commission reversed its previous finding and included them within its orders.[5] Both carriers filed bills in the District Court to enjoin the enforcement of all the orders except in so far as the second exempted them from the finding of preference and prejudice. The cases were consolidated, and upon final hearing before three judges the bills were dismissed.[6] The plaintiffs, Texas & Pacific and L. R. & N., and also the State of Louisiana, the New Orleans Traffic Bureau and other intervenors appealed.

The Texas ports are served by some half dozen lines which either themselves or through their connections reach the areas of origin or destination embraced in the Commission's order. Generally speaking their routes trend north rather than east of Galveston. The Southern Pacific is the only carrier serving both Galveston and New Orleans. Texas is also connected with New Orleans by the Gulf Coast Lines, by the Texas & Pacific, extending east from El Paso through Dallas and Fort Worth to Shreveport, La., and thence southeast to New Orleans, and by the L. R. & N., which connects eastern Texas and western Louisiana with that port. Several other lines extend between New Orleans and western Louisiana, Arkansas, Kansas, and Oklahoma.

With minor and immaterial exceptions the carriers serving the Texas ports and New Orleans have for many years equalized the import and export commodity car-load rates between the territory embraced in the Commission's orders and Galveston and New Orleans. The gravamen

---

[4] 128 I.C.C. 349. [6] 42 F. (2d) 281.
[5] 160 I.C.C. 345.

of the complaint is that in many instances the distance to New Orleans is so much greater than that to the Texas ports, and the increased haul so important a part of the service rendered, that this factor should be reflected in a fixed differential in rates. The Commission's order prescribing differentials is challenged only in so far as it compels the Texas & Pacific and the L. R. & N. to establish rates to New Orleans higher by the amount of the fixed differentials than those charged between the same interior points and the Texas ports. Inasmuch as the assertion of unreasonableness was withdrawn and the Commission made no finding that the Galveston rates were unreasonable, the prohibitions of § 1 of the Act to regulate commerce, as amended, are not involved.[7] The evidence failed to show that the rates of the Texas & Pacific and the L. R. & N. on export and import shipments to and from New Orleans were not compensatory. The Commission refused to find that they were so low as to cast a burden on other traffic. There was therefore no basis for an order fixing minimum reasonable rates under § 15 (1) of the Act.[8] The parties agree that authority for the order must be found in § 3 (1), which is:

" It shall be unlawful for any common carrier . . . to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." [9]

The appellants contend that in the circumstances disclosed the ports as such are not localities preferred or

---

[7] U.S.C. Tit. 49, § 1.
[8] U.S.C. Tit. 49, § 15 (1).
[9] U.S.C. Tit. 49, § 3 (1).

prejudiced, but that if they may be so denominated the Texas & Pacific and the L. R. & N. can not be held responsible for any undue prejudice to the Texas ports, since they do not reach those ports with their own lines or control the rates to or from them. They also assert that the orders violate Article I, § 9, of the Constitution, which prohibits any regulation of commerce giving preference to ports of one State over those of another; are without support in the evidence, and arbitrary.

The cause has been twice argued; it was first presented at the October Term, 1931, and on account of the importance of the questions involved a reargument was ordered and was had at the October Term, 1932.[10] Statement of certain facts and settled principles will tend to clarify and define the issues presented.

The traffic with which we are concerned does not move on through bills of lading, but the movement is, nevertheless, from points of origin to a foreign or coastal destination, or vice versa, and is, therefore, essentially through transportation. Compare *Binderup* v. *Pathe Exchange,* 263 U.S. 291, 309. As the Commission said in this case, "A port is neither the destination nor the origin of traffic passing through it. It levies toll on the traffic, in substantially the same manner as do common carriers, in its charges for the use of its facilities in the transfer of traffic between the rail and water carriers."

---

[10] " This cause is restored to the docket for reargument upon all questions involved, and the attention of counsel is invited to the question whether the respective relations of the Louisiana ports and the Texas ports to the export, import, and coastwise traffic affected, and to the rates condemned, by the orders in controversy are such that the Louisiana ports may be regarded as localities unduly or unreasonably preferred by such rates within the sense and meaning of sections 3 (1) and 15 (1) of the interstate commerce act and that the Texas ports may be regarded as localities unduly or unreasonably prejudiced by such rates within the sense and meaning of the same sections." Journal, October Term, 1931, p. 342.

Although the shipper in the first instance consigns the commodity to the port and a separate contract is made for ocean carriage, the through rate none the less consists of the rail rate to the port, plus the ocean freight, which is the same from all Gulf ports.[11]

The choice of route is determined solely by the rail rates from or to the ports. If these are equalized the shipper has an option; but if they are disparate the route through the port taking the higher rate is necessarily excluded. A very slight differential in the rail rate, in some instances as little as a fraction of a cent per hundred pounds, will divert the traffic through the port so advantaged. The application of a distance scale to the rail rate automatically precludes shipment through the more distant port.

Long prior to the passage of the Act to regulate commerce the railroads, recognizing this situation, and desiring to hold to their own lines the traffic running to ports which they served, equalized rates through the ports reached by their own lines with those maintained by their rivals to other ports, or established differentials in favor of their own ports in order to retain a portion of the competitive export business. And a carrier serving two ports has for like reason fixed an equal or lower rate to the more distant of the two, solely to meet the competition of rivals who reached it by more direct routes. These practices have not been indulged either to aid or to harm a port as such, but solely to obtain or retain business for the carrier's own line.[12] With the abstract fairness of such ad-

[11] The evidence shows that the regular steamship lines make the same rates to foreign destinations from all Gulf ports. Tramp steamers occasionally cut the conventional rate, but this may happen at any port, and the opportunity to obtain such a reduced rate does not depend upon the choice of port through which shipment shall be made.

[12] New York Produce Exchange v. B. & O. R. Co., 7 I.C.C. 612; In re Differential Rates, 11 I.C.C. 13.

justment neither the Commission nor the courts have any concern. This is not to say, however, that the rates promulgated are beyond the Commission's jurisdiction. While that body has no control over the ocean rate, it has power to compel a reasonable charge for the rail haul. Compare *Armour Packing Co.* v. *United States,* 153 Fed. 1; *News Syndicate Co.* v. *New York Central R. Co.,* 275 U. S. 179, 186-7.[13] As the carriers are in competition for the business they may, within the zone of reasonableness,[14] prescribed by the statute, adjust their rates so as to obtain or retain the desired traffic for their own lines. *Interstate Commerce Comm'n* v. *Alabama Midland Ry. Co.,* 74 Fed. 715, 723-4; 168 U.S. 144, 172-3; *Skinner & Eddy Corp.* v. *United States,* 249 U.S. 557, 564; *United States* v. *Illinois Central R. Co.,* 263 U.S. 515, 522.

The theory of the Act is that the carriers in initiating rates may adjust them to competitive conditions, and that such action does not amount to undue discrimination; *Texas & Pacific Ry. Co.* v. *Interstate Commerce Comm'n,* 162 U.S. 197. There the charging of rates on import traffic moving from a port on through bills of lading, much lower than those fixed for domestic transportation, was held not to amount as matter of law to discrimination forbidden by § 3. The carrier showed, in justification of the lower rates on import traffic, that unless these were permitted water and rail-and-water competition would divert the traffic away from the port of New Orleans and the carrier's lines extending from that

---

[13] In Chamber of Commerce of New York *v.* N. Y. C. & H. R.R. Co., 24 I.C.C. 55, 74, the Commission said: "We have no jurisdiction of the ocean rates and must deal with this question as though the ports were destinations instead of gateways."

[14] Since 1887, § 1 has forbidden that an export or import rate be unreasonably high; and since the Transportation Act, 1920, the Commission has been charged to see that the rate be not so low as to render the receipts of the business unremunerative.

port. Since that decision it has been recognized that export and import shipments, although not made on through bills, might lawfully be transported at rates below those charged for domestic traffic between the same points.[16] The same purpose not to stifle competition justifies relief under § 4 from the prohibition against charging the same or less for a longer than for a shorter haul. *Interstate Commerce Comm'n* v. *Baltimore & Ohio R. Co.*, 145 U.S. 263, 276; *Interstate Commerce Comm'n* v. *Alabama Midland Ry. Co.*, 168 U.S. 144, 164; *Louisville & N. R. Co.* v. *Behlmer*, 175 U.S. 648, 671; *Intermountain Rate Cases*, 234 U.S. 476, 483–485. And relief under the Fourth Section has been granted on this ground in respect of export and import rates. Export and Import Rates, 169 I.C.C. 13.

While the carriers may, therefore, meet competition by equalizing rates or maintaining differentials both to interior points and to ports, they may not adjust their rates with the motive of injuring or aiding a shipper, a particular kind of traffic, or a locality, for so to do is to depart from the transportation standard, conformity to which the Act contemplates, and substitute others which are prohibited. A tariff published for the purpose of destroying a market or building up one, of diverting traffic from a particular place to the injury of that place, or in aid of some other, is unlawful; and obviously, what the carrier may not lawfully do, the Commission may not compel. *Southern Pac. Co.* v. *Interstate Commerce Comm'n*, 219 U.S. 433, 444; *Interstate Commerce Comm'n* v. *Diffenbaugh*, 222 U.S. 42, 46; *Ellis* v. *Interstate Commerce Comm'n*, 237 U.S. 434, 445; *United States* v. *Illinois Central R. Co.*, 263 U.S. 515, 524; *At-*

---

[16] New Orleans Board of Trade v. Illinois Cent. R. Co., 23 I.C.C. 465; In re Import and Domestic Rates, 36 I.C.C. 389; In re Import and Domestic Rates—Clay, 39 I.C.C. 132.

*chison T. & S. F. Ry.* v. *Interstate Commerce Comm'n,*
190 Fed. 591; *Anchor Coal Co.* v. *United States,* 25 F.
(2d) 462, 471.[16]

■ In the light of the facts exhibited by the record and
the principles underlying the Act, are ports, in respect of
export, import and coastwise traffic, localities susceptible
of undue preference or prejudice within the meaning of
§ 3? The purpose of §§ 2, 3 and 4, as exhibited by com-
mittee reports and explained by those in charge of
the bill in Congress, was to prevent unjust discrimination
resulting from existing practices. Similar commodities
were, without reason or excuse, carried at different rates.
Shippers similarly situated were put on unequal terms.
Producers and consumers at points of origin and destina-
tion were prejudiced by unequal treatment in the matter
of rates or service. Obviously localities of origin or desti-
nation might also be prejudiced by undue discrimination.
One of the most prevalent and reprehensible practices at
which the Act was aimed was the charging of a less or
an equal rate for a longer haul upon the same line or
route. The Act was passed for the protection of those
who pay or bear the rates. The standards it establishes
are transportation standards, not criteria of general wel-
fare. The word "localities," therefore, has its proper
office as denoting the origin or destination of traffic and
the shipping, producing, and consuming areas affected by
rates and practices of carriers. The term was, however,
not intended to cover a junction, a way station, a gate-
way, or a port, as respects \traffic passing through it.

Considered as points of origin or destination any or
all of these are localities within the purview of the section.

---

[16] The Commission has recognized the same principle. Ashland Fire
Brick Co. *v.* Southern Ry. Co., 22 I.C.C. 115, 121; Chamber of Com-
merce of New York *v.* N. Y. C. & H. R.R. Co., 24 I.C.C. 55, 63, 70,
75; Maritime Assn. of Boston *v.* Ann Arbor R. Co., 95 I.C.C. 539, 565.

All of them may, moreover, though not considered as localities served, be involved in acts of discrimination. The situation here presented furnishes a close analogy to proportional rates or combination rates, and with respect to either of these the charge on shipments through a given gateway or port may discriminate against traffic passing through another so as to deprive a shipper of his right of choice of route through either.[17] In such case, however, the discrimination operates upon the shipper, not upon the port. There are through rates, proportional rates, and combination rates, applicable to traffic routed through river crossings and gateways. It seems too plain for argument that the Commission has no authority, upon a showing by a gateway that under an existing tariff too much traffic passes through another, or too little through it, to readjust the rates and prescribe differentials so as to divert traffic through the complaining gateway. The interests and industries of a gateway are not entitled thus to obtain a benefit reflected from additional traffic which would be diverted by such action of the Commission. We perceive no difference in principle as to export or import traffic routed through ports.

The legislative history of the Act demonstrates that Congress did not intend to forbid the equalization of export or import rates by lines serving several ports in order to meet competition. These rates, it was said, were not to be proportioned to the respective distances between inland origins or destinations and the ports.[18] Both

[17] Mobile Chamber of Commerce v. Mobile & Ohio R. Co., 32 I.C.C. 272; Astoria v. Spokane, Portland & Seattle Ry. Co., 38 I.C.C. 16.

[18] See the explanation of Senator Cullom, chairman of the Committee having charge of the original bill, Cong. Rec., 49th Cong., 1st Sess., Vol. 17, Part 4, pp. 3471, 3472. House proceedings, Cong. Rec., Vol. 17, Part 7, pp. 7277, 7294, 7298. And see the Report of the Committee of the Senate, Report No. 46, 49th Cong., 1st Sess.,

equalizations and differentials had for some time been maintained in the rates to various Atlantic ports. Congress was aware of this, and had no intention of interfering with the maintenance of these rate adjustments.

Appellees say, however, that the Commission has always treated ports as localities within the meaning of § 3, and exercised the power to abate discrimination by prescribing differentials in export rates. They add that though the Act has been several times amended, this section has been retained in its original form and Congress has thus sanctioned the Commission's interpretation. Where a statutory body has assumed a power plainly not granted, no amount of such interpretation is binding upon the courts. *Interstate Commerce Comm'n* v. *C., N. O. & T. P. Ry. Co.,* 167 U.S. 479, 510. This we think is the situation here presented, for, as we have said, the word localities is used with reference to places of origin and

---

p. 57, referring to the investigation by a committee of the British Parliament:

" Other important conclusions were reached by the Committee a follows:

" ' That a system of equal mileage rates, or charges in proportion to distance, was inexpedient and impracticable for the following reasons:

" ' (a) It would prevent railway companies from lowering their fares and rates, so as to compete with traffic by sea, by canal, or by a shorter or otherwise cheaper railway, and would thus deprive the public of the benefit of competition, and the company of a legitimate source of profit.

" ' In short, to impose equal mileage on companies would be to deprive the public of the benefit of much of the competition which now exists, or has existed, to raise the charges on the public in many cases where the companies now find it to their interest to lower them, and to perpetuate monopolies in carriage, trade, and manufacture in favor of those rates and places which are nearest or least expensive where the varying charges of the companies now create competition.' "

destination; its employment is not intended to permit the Commission, in its discretion, to favor or hamper a community having no such relation to the service of transportation.

Moreover we do not find that any such settled construction had been adopted or that Congress intended to sanction it. With few and occasional exceptions the Commission has not until a recent date essayed to prescribe differentials in export rates. Prior to the Hepburn Amendment in 1906, port differentials were considered in three cases.[19] In the first certain carriers applied for leave to equalize their export rates to Boston with those charged to New York. The petitions were dismissed on the ground that the Commission should not authorize what the carriers might lawfully do without permission. In the second, a New York trade association complained that the maintenance of differentials in export rates to Philadelphia and Baltimore voluntarily established by the carriers worked undue prejudice against New York. The Commission found they did not result in undue prejudice; though it treated the ports as localities which would be entitled to relief under a proper showing. In the third case shippers and carriers serving north Atlantic ports submitted to the Commission the question of the fairness of the current differentials, and that body acted merely as an arbitrator and not in its official capacity.

The legislative history of the Hepburn amendment discloses a clear intent not to confer power to circumscribe the adjustment of export and import rates by the carriers to meet competition.[20] The expressions used disclose

---

[19] Export Trade of Boston, 1 I.C.C. 24 (1887); New York Produce Exchange v. B. & O. R. Co., 7 I.C.C. 612 (1898); In the Matter of Differential Rates, 11 I.C.C. 13 (1905).

[20] Cong. Rec., 59th Cong., 1st Sess., Vol. 40, Part 2, pp. 1777, 1788; Part 3, pp. 2084, 2085, 2086, 2247, 2248; Part 4, p. 3792; Part 5, p. 4111; Part 7, p. 6683. Representative Mann, a member of the

no thought that the Commission had held the contrary.[21]

. Between the dates of the Hepburn amendment and the Transportation Act, 1920, the Commission had before it two cases relevant to the power to prescribe port differentials.[22] In the first the Commission recognized its lack of power to deal with the relationship of the rates.[23] In

committee, said, in explaining the purposes of the bill before the House (Cong. Rec., Vol. 40, Part 3, p. 2247): ". . . We do not give them the power to say which port shall be built up, which city shall be preferred; we leave open the competitive forces of the railways. The old bills which we had sought to stifle competition; we leave competition in force. The railroads running south, west of the Mississippi, and the railroads running east, north of the Ohio, will have to fight out the question as to which road shall carry the grain for export abroad."

And again: "It will not give the Commission the power to determine differentials, the power to say whether grain from the Northwest shall be shipped for export by way of the Gulf ports or the north Atlantic ports, the power to destroy the law of competition. . . ."

There is much more to the same effect.

[21] Report No. 591, 59th Cong., 1st Sess., p. 3: "As but little complaint has been made to the committee concerning classification, it was not deemed wise at this time to suggest new legislation upon that subject. So, too, with the question of the relation of rates. The committee has not deemed it wise at this time to suggest new legislation to change existing law upon that subject. It is one of very great importance—interesting, however, as a rule, to certain particular communities rather than to the public at large. It involves conflicts between towns and cities rather than the public generally, and it relates more to the building up of certain local interests of a local nature rather than to the interests of the people of the whole country."

[22] Chamber of Commerce of N. Y. v. N. Y. C. & H. R.R. Co., 24 I.C.C. 55; Astoria v. S. P. & S. Ry. Co., 38 I.C.C. 16.

[23] It said (24 I.C.C. 75): ". . . the Boston interests join in the contention that the railroads should so adjust their rates as to insure movement of a certain or substantial part of the traffic through those ports. Neither the carriers nor the Commission has any right to undertake to so apportion the traffic between rival ports or cities.

the second the complaint was that Astoria was prejudiced by exaction of higher export rates from origin territory than those to Seattle and Tacoma. Though the haul to Astoria was longer, the Commission required equalization. The Commission in this case asserted its authority to deal with export rate relationship solely in the interests of the affected ports. Whether the order made was within the competence of that body or not, the important fact is that it did not prescribe differentials, but in the interest of competition opened the three ports to export shipment on equal terms.[24]

We think that at the date of the passage of the Transportation Act, no such administrative practice had been established as to require the conclusion that in failing to amend § 3 the Congress approved any asserted power to adjust export and import rates in the interests of the ports alone.

It remains to determine whether since 1920 there has been such a uniform and repeated assertion of this authority as would constrain us to adopt the principle. The instances in which the Commission has considered export and import traffic fall into several classes: First, where shippers' complaints concerning port differentials established by carriers were dismissed,[25] or were found justified and prejudice ordered removed;[26] secondly, where, on

---

. . . the Pennsylvania and the Baltimore & Ohio have the lawful right to maintain lower rates to and from Baltimore and Philadelphia than they contemporaneously maintain to and from New York. They would probably also have the right to make these rates the same to and from all of those ports if they chose to do so. The Boston lines have an undoubted right to make such rates to and from Boston as their interests demand, subject only to the limitations that the rates must be reasonable; . . ."

[24] Compare, however, Galveston Commercial Assn. v. A. & S. Ry. Co., 109 I.C.C. 114, 125.

[25] Cotton and Cotton Linters to Pacific Coast Ports, 69 I.C.C. 735; Sugar Cases, 1922, 81 I.C.C. 448.

[26] Canned Goods, Iron & Steel from Gulf Ports, 91 I.C.C. 623.

shippers' complaint against differentials, equalization of rates was ordered;[27] thirdly, where on complaint by a port differentials voluntarily established by the carriers were altered.[28] These are not relevant to the present controversy. In two decisions rendered prior to the instant one the Commission, on complaint of port interests, exercised the supposed power to compel the establishment of differentials as between ports.[29] But we are not persuaded these rulings form a body of administrative action sufficient to overthrow the evident purpose of § 3.

We conclude that ports as such are not localities with respect to export and import traffic routed through them, susceptible of undue preference or prejudice within the intent of the Act.

While the Commission's jurisdiction of port rate relation was fully argued, the appellees seek to support the orders under the power to abate discrimination between persons and shippers. The argument is based upon averments of the complaint as to prejudice of persons at Galveston. There is, however, no allegation that shippers or consignees in the interior, are prejudiced or preferred by the equalization of the New Orleans rates with those to the Texas ports, and the Commission made no finding of preference or prejudice of shippers or consignees, or localities of origin and destination.[30] It compared at great

---

[27] Inland Empire Shippers League v. Director General, 59 I.C.C. 321.

[28] Maritime Assn. v. Ann Arbor R. Co., 95 I.C.C. 539; 126 I.C.C. 199.

[29] Coffee from Galveston and other Gulf Ports, 58 I.C.C. 716; 64 I.C.C. 26; Charleston Traffic Bureau v. Alabama G. S. R. Co., 89 I.C.C. 501. In a number of other cases the Commission has indicated a belief that it possessed such authority.

[30] In a dissenting opinion Commissioner Hall said (128 I.C.C. 399): "In deciding this strife between Texas ports and Louisiana ports, confined as it is to import, export, and coastwise rates, the producers and shippers who pay those rates seem to have been lost from sight."

length the facilities of the ports, their volume of traffic, the relative growth of their export and import business, their respective steamship facilities, and reached the conclusion that though relative distance is not conclusive and competitive conditions are to be regarded, the Texas ports are entitled to an advantage in rate consequent upon the shorter haul to and from the interior territory. The Commission's three reports abound with statements that a differential in favor of the Texas ports will divert traffic running to New Orleans and send it through the Texas ports. Petroleum is one of the commodities as to which complaint was made. There is no transportation difference discoverable in the record between this traffic and that of the other freights affected by the order. But the Commission concluded that New Orleans was not receiving more than its fair share of this business, and that a differential advantage would be of little benefit to the Texas ports by diverting this commodity to them, and therefore refused to make any order respecting the rates on petroleum and its products.[31] It has since, apparently upon similar considerations, refused to prescribe differentials in the rates on blackstrap molasses.[32] The actual basis of the decision is, moreover, avowed by the Commission. In the first report it said:

" We find that the present relationships of the assailed rates on export, import, and coastwise traffic, . . . are unduly prejudicial to Galveston and unduly preferential of New Orleans." (100 I.C.C. 122.)

In its second report it stated:

" We find that the present parity of rates as between the Texas and Louisiana ports . . . does not result in substantial injury to the Texas ports in respect of

---

[31] See the Commission's findings, 128 I.C.C. 366, 372, 374–376 and the opinions of Commissioners McManamy and Taylor, 128 I.C.C. 399.

[32] Blackstrap Molasses from Louisiana Points and Ports, 171 I.C.C. 583, 591.

petroleum and its products, but does result in substantial injury to and prejudice against the Texas ports in respect of the other commodities considered." (128 I.C.C. 388.)

And finally:

"Upon further consideration we now find . . . that the present relationships of the assailed carload rates on export, import and coastwise traffic . . . are, and for the future will be, unduly prejudicial to Galveston and the other Texas ports taking the same rates, and unduly preferential of New Orleans." (160 I.C.C. 359.)

The action of the Commission cannot be justified upon any theory that it was protecting shippers and consignees, who would naturally desire all possible routes for foreign shipment. On the contrary, the orders prohibited a practice born of competition, and not proved to involve a loss of revenue to the appellants. The plain purpose of the orders was to build up the Texas ports by diverting export and import traffic to them. As we have shown, § 3 grants no such power.

■ The Commission's action is challenged for another, and wholly independent reason, which, if sustained, also requires a reversal of the decree. By its second order the Commission excluded the Texas & Pacific and the L. R. & N. from its findings of undue preference and prejudice and exempted them from the requirement as to differentials. The Texas & Pacific had been included by the first order on the theory that it was part of the Missouri Pacific system which served both New Orleans and the Texas ports. Upon rehearing the conclusion was that the line was independently operated. Exemption was thereupon granted both appellants pursuant to a rule which the Commission had consistently followed since its organization: namely, that a carrier may not be held responsible for undue prejudice or preference unless both of the localities affected are upon its lines, or it effectively participates in the rates to both. In the final report these roads were

denied exemption under the belief that this court had held the principle inapplicable in the circumstances here disclosed. The appellants insist the rule is a reasonable one, consonant with the purposes of the Act, and that our decisions have not narrowed it so as to exclude this case from its scope.

The line of the Texas & Pacific in Texas is intersected at intervals of about 40 miles by north-and-south lines directly or indirectly serving the Texas ports. The population of these junction points is over ten times as great as that of all other open stations on this appellant's line in Texas, and the greater volume of export and import traffic originates and terminates at the junctions.[33] Thus the question is whether the Texas & Pacific may continue to participate in the handling of the traffic moving through the ports to and from points on its own rails, on an equality of rates with competing lines which extend to the Texas ports, or may be forbidden so to do because it is a party with the competing carriers to joint rates from stations on its own line to the Texas ports. The same issue is presented with respect to the L. R. & N. Neither of the appellants controls the rates to the Texas ports and the Commission so finds.[34] Though the Texas port lines can reduce their rates to and from those ports without the concurrence of the New Orleans lines, no reductions can be made in those rates by the New Orleans lines,

---

[33] The conditions on the L. R. & N., while differing in fact from those affecting the T. & P., present the same question and need not be separately stated.

[34] The finding is: " The New Orleans carriers participate in a full line of joint commodity rates to and from Gulf ports from and to both the junction and local points on their lines. While, under the rules governing the southwestern carriers and their tariff-publishing agents, the New Orleans carriers have the power to increase the rates from points served by them to the Texas ports without concurrence of their connections, a reduction in such rates would require the consent and concurrence of the participating Texas lines." (160 I.C.C. 356.)

even from or to their local stations, without the concurrence of one or more lines reaching the Texas ports. Clearly the New Orleans carriers have no effective control over the rates between their junction points and the Texas ports. As respects local stations, their participation in joint rates with the lines to Texas ports is required by § 1 (4) of the Act; but such rates may not be higher than reasonable maxima fixed by national or state authority nor lower than the amount agreed to by their connections to the Texas ports. The appellants insist that their compulsory participation in rates to and from the Texas ports has no legal significance, and the question remains whether they in fact exercise effective control over those rates.

The classical case of discrimination in rates is presented where a single carrier serving two points approximately equidistant from a common origin on the carrier's line, exacts unequal rates for the two hauls. Not only is the prejudice obvious, but equally so the ability of the carrier to abate it by raising the rates to the point enjoying the lower rates, or decreasing those to the point subject to the higher charge. The principle comprehends, as well, instances of joint rates where the same carriers participate in the rates to both points,[35] and where the originating (or delivering) carriers are different, but the delivering (or originating) carriers are the same.[36] So, too, a carrier may be responsible for preference or prejudice where it participates in one of several through routes between point of origin and the prejudiced destinations, although its own line may reach only one or neither of the latter, *St. Louis S. W. Ry.* v. *United States*, 245 U.S. 136, for the discrim-

---

[35] *Southern Ry. Co.* v. *United States*, 204 Fed. 465; *Chicago, I. & L. Ry.* v. *United States*, 270 U.S. 287; Rates on Grain Milled in Transit, 35 I.C.C. 27.

[36] Lake Dock Coal Cases, 89 I.C.C. 170; Seneca Wire & Mfg. Co. *v.* B. & O. R. Co., 112 I.C.C. 95.

ination is brought about by the disparity of rates, and the order requiring its abatement necessarily runs against all the carriers parties to them. If one or more of the rail-roads whose lines make up the through route should refuse, upon an order to equalize rates, to afford one of the others a proper division of the rate, the latter may obtain redress from the Commission under § 15 (6). Where, however, a carrier whose lines reach, or which controls the rate to, one of the destinations, is a party to a joint rate to the other but cannot make or control the latter rate, or though it were to withdraw as a party thereto, or to cancel the rate, the discrimination would still continue—it cannot be held responsible, nor can any order to remove the prejudice run against it.[37] This rule has been consistently applied in respect of export and import rates to the ports.[38] The reason for the doctrine is that preference or prejudice can be found only by a comparison of two rates. If these are the rate of one

[37] This doctrine has been applied by the Commission in at least forty-five cases, under varying circumstances containing one or more of the elements mentioned. It was first announced soon after the organization of the Commission in Eau Claire Board of Trade v. C. M. & St. P. R. Co., 5 I.C.C. 264, was elaborated in Ashland Fire Brick Co. v. Southern Ry. Co., 22 I.C.C. 115, and has been referred to as the doctrine of the Ashland Fire Brick case since that time. For a reference to some of the decisions applying the rule see the dissenting opinion of Commissioner Porter in Duluth Chamber of Commerce v. C. & N. W. Ry. Co., 156 I.C.C. 156, 173.

[38] Chamber of Commerce of New York v. N. Y. C. & H. R.R. Co., 24 I.C.C. 55, 75; Molasses from Mobile, 28 I.C.C. 666, 669; Sugar Cases of 1922, 81 I.C.C. 448, 471; Valley Camp Coal Co. v. B. & O. R. Co., 88 I.C.C. 682, 686; Maritime Assn. of Boston v. Ann Arbor R. Co., 95 I.C.C. 539, 565, 572-3, 574, 575; id., 126 I.C.C. 215; Lake Cargo Coal Rates, 1925, 101 I.C.C. 513, 545; Mobile Chamber of Commerce v. M. S. B. & P. R. Co., 129 I.C.C. 419, 422; Bananas from Gulf Ports, 140 I.C.C. 682 (Eastman, Commissioner, concurring, at p. 684); Lake Charles Harbor & T. Dist. v. Brimstone R. & C. Co., 157 I.C.C. 720, 723.

carrier to point A and that of another to point B while a relationship of one to the other may be determined neither the first nor the second carrier alone can be held to have created the relation. Assuming that neither rate is unreasonable, the one carrier cannot be compelled to alter its rate, because the other's is higher or lower for the same service. A carrier or group of carriers must be the common source of the discrimination—must effectively participate in both rates, if an order for correction of the disparity is to run against it or them. Where an order i: made under § 3 an alternative must be afforded.[39] The offender or offenders may abate the discrimination by raising one rate, lowering the other, or altering both. Compare *American Express Co.* v. *Caldwell*, 244 U.S. 617, 624; *United States* v. *Penna. R. Co.*, 266 U.S. 191; *Chicago, I. & L. Ry. Co.* v. *United States*, 270 U.S. 287, 292; *Minneapolis & St. L. R. Co.* v. *Peoria & Pekin U. R. Co.*, 270 U.S. 580, 582. The situation must be such that the carrier or carriers if given an option have an actual alternative.

The principle has been approved in decisions of this court with respect to practices, *Interstate Commerce Comm'n* v. *Diffenbaugh*, 222 U.S. 42; *Central Railroad of New Jersey* v. *United States*, 257 U.S. 247, and rates, *East Tenn. V. & G. Ry. Co.* v. *Interstate Commerce Comm'n*, 181 U.S. 1; *Penn Refining Co.* v. *Western N.Y. & P. R. Co.*, 208 U.S. 208, 221.

In the *Central Railroad* case it was said (p. 259): "But participation merely in joint rates does not make connecting carriers partners. They can be held jointly and severally responsible for unjust discrimination only if each carrier has participated in some way in that which causes the unjust discrimination; as where a lower joint rate is

---

[39] This is not true of an order pursuant to § 15 (1), prescribing maximum or minimum or maximum and minimum rates; but the present orders were not issued under that section.

given to one locality than to another similarly situated. (Citing cases.) If this were not so, the legality or illegality of a carrier's practice would depend, not on its own act, but on the acts of its connecting carriers . . . What Congress sought to prevent by that section [3], as originally enacted, was not differences between localities in transportation rates, facilities and privileges, but unjust discrimination between them by the same carrier or carriers." While this language was used with respect to circumstances differing from those here disclosed, it applies to the situation of appellants, who are by the Commission's order held responsible for what is not and cannot be the result of their own acts,—the level of the rates to the Texas ports.

In the *East Tennessee* case the court said (p. 18):

" The prohibition of the third section, when that section is considered in its proper relation, is directed against unjust discrimination or undue preference arising from the voluntary and wrongful act of the carriers complained of as having given undue preference, and does not relate to acts the result of conditions wholly beyond the control of such carriers."

The appellees contend, however, and the Commission concluded that in later cases the court has held the principle inapplicable in circumstances so like those here exhibited that it should not control our decision in the instant case. One of these is *St. Louis S. W. Ry. Co.* v. *United States,* 245 U.S. 136, cited for the proposition that the Commission has power to prevent carriers which participate in rates from blanket territory from discriminating against a particular destination, although one of them does not with its own lines reach such destination, but bills through traffic to it over connecting lines. The order there under review was for the establishment of a reasonable joint rate, or in the alternative new through routes with joint rates, under § 15 of the Act, and was held by

this court to be primarily an order under that section, and not under § 3. The statement with respect to the possibility of unjust discrimination by all the participating carriers, even though the rails of some did not reach the locality prejudiced, is clearly sound, but is beside the point here in issue; for in that case no question as to the control of the rate to both points by any carrier affected by the order was raised or decided.

*Chicago, I. & L. Ry. Co.* v. *United States,* 270 U.S. 287, is relied upon because of the statement in the opinion [p. 293] that " Wherever discrimination is, in fact, practiced, an order to remove it may issue; and the order may extend to every carrier who participates in inflicting the injury." This was said with respect to a mandate to three carriers serving Michigan City, each of which had refused to enter into interchange arrangements with an electric railroad. Their lines did not connect directly with the electric line, but required for interchange the service of an intermediate switching carrier. The order of the Commission was held proper because each defendant railroad was solely responsible for the prejudice resulting from its own refusal to maintain interchange arrangements with the electric line, and for the preference of maintaining such arrangements with other carriers at Michigan City. Each could, without reference to the conduct of any other, correct the unjust discrimination which it individually practiced. The very question here is whether the New Orleans lines in fact control the rates to the Texas ports and the Commission has answered it in the negative.

Principal reliance is placed upon *United States* v. *Illinois Central R. Co.,* and *Wyoming Ry. Co.* v. *United States,* 263 U.S. 515. In the first it appeared that the Illinois Central equalized rates on lumber to certain destinations from all its main and branch line points in blanket origin territory, and from points on certain independent short lines within the blanket area, but refused

to extend similar blanket rates to producing points on the Fernwood & Gulf, an independent short line serving the same area. The Illinois Central's excuse was that it could not afford to shrink its earnings by larger divisions to the Fernwood & Gulf. The complaint before the Commission was against both carriers and the Commission required that both should abate the unjust discrimination.[40]

In the second case it was shown that the Burlington published a blanket rate on lumber to destinations on a portion of its main line and to points located on its branch lines, but refused to join in an equal rate to a point on an independent branch line connected with the blanketed portion of the main line. The service to the latter point at the higher combination rate was less than was rendered to points on the Burlington's branch lines. The Commission ordered both carriers to abolish the undue preference and prejudice.[41]

It will be noted that in the one case the Illinois Central and in the other the Burlington made the one rate and was a party to the other. Not only so, but in each case the trunk line carrier controlled the joint or combination rate to or from the prejudiced locality. Quite clearly the independent line could not equalize that rate with the one in force to the preferred locality without the concurrence of the trunk line. Both railroads joined in the bill to enjoin enforcement of the order in the *Illinois Central* case, but only the independent carrier filed the bill in the *Burlington* case.

The appellees insist that as the orders ran against the independent road as well as the trunk line, and this court refused to set them aside, it necessarily follows that a carrier may be liable for unjust discrimination by virtue of its mere participation in one of the rates whether or

---

[40] Swift Lumber Co. *v.* F. & G. R. Co., 61 I.C.C. 485.

[41] Pioneer Lumber Co. *v.* Director General, 64 I.C.C. 485.

not it controls that rate. The argument ignores the substance and basis of the decision. The trunk line controlled both rates, and by its action alone could the disparity be corrected. But the short line was a party to one of the rates which created the illegal relation; and was therefore properly joined in the order. Compare *Virginian Ry. Co.* v. *United States,* 272 U.S. 658, 665. The fact, however, that the order included the short line is entirely insignificant on the question whether the same carrier in fact controlled both rates and was, in fact, responsible for the undue preference and prejudice. The contention of the short line that it did not participate in the discrimination because it did not join in the lower rates to the preferred locality maintained by the Illinois Central, and could not, therefore, by its own act, remove the discrimination, was properly overruled. As said by the court, that carrier, in joining the Illinois Central in establishing the prejudicial through rate, was as much a party to the discrimination as if it had also joined in the lower rates to the other points alleged to be unduly preferred. If Fernwood & Gulf could not persuade the Illinois Central to join in a new non-discriminatory rate and accord it a proper division, it had a plain remedy under § 15 of the Act. To make the decision a precedent for the instant case it would have to be found that the New Orleans carriers effectively controlled both the rates to New Orleans and those to the Texas ports. If they did, obviously an order might run not only against the New Orleans carriers but against their connections to the Texas ports, albeit the latter did not control those rates.

We find nothing in any of the decisions which renders inapplicable the principle upon which the Commission has acted, with the approval of this court, for more than forty years in the administration of § 3, and conclude that the New Orleans lines could not properly be held guilty of unjust discrimination against the Texas ports in the ab-

sence of a finding of effective participation in the rates to them.

■ The conclusions announced render it unnecessary to consider the other questions pressed by the appellants.

The judgment must be reversed and the cause remanded to the District Court for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE STONE, dissenting.

The Interstate Commerce Commission, acting under § 3 (1) and § 15 (1), of the Interstate Commerce Act, 24 Stat. 379, as amended by Transportation Act, 1920, 41 Stat. 456, after extensive investigation, has found that the rates of rail carriers on commodities moving in import, export and coastwise transportation from or to points in Texas, Oklahoma and southern Kansas, and in Louisiana west of the Mississippi River were unduly prejudicial to Galveston and other Texas gulf ports and unduly preferential of New Orleans. Its order, framed to restrict, but not to remove entirely the discrimination, sustained by the District Court of three judges below, is now held void and set aside by this Court. I think that the order is within the competency of the Commission, is supported by the evidence, and should in all respects be upheld.

Stated generally, the discrimination complained of is the maintenance of rates by the rail carriers which give no recognition to the proximity of Galveston and other Texas ports to the interior points involved. The rates thus deprive the Texas ports of the natural advantage of their geographical position over that of a rival port, New Orleans; and as the commercial advantages of New Orleans exceed those of the Texas ports, the rates result in the diversion of traffic to the former from territory normally tributary to the latter. The Commission found that although the length of haul from the interior shipping

points to the Texas ports is less than that to New Orleans, the difference varying from 162 to 213 miles from typical points,[1] the carriers have long maintained the same, and in many instances substantially lower rates to New Orleans. In territory nearer to New Orleans than to the Texas ports, the lesser service has, on the other hand, been given recognition by correspondingly lower rates. The Commission has found, and it is not questioned, that transportation costs and conditions throughout the southwest territory are substantially the same; that the rates established by the carriers disregard generally and materially the amounts and costs of service; that the discrimination has deprived and will continue to deprive the Texas ports of the natural advantage of their more favorable geographical position, and has resulted and will continue to result in building up the port of New Orleans to their detriment and at their expense. The order assailed seeks to curtail this discrimination and the injury which it inflicts. It leaves undisturbed the lower rates in force to New Orleans from points nearer that city than Galveston and permits parity of rates where the distance to New Orleans does not exceed that to Galveston by more than 25%, but for differences in distance exceeding 25% it has named minimum differentials under the rates maintained to New Orleans.

In holding that the Commission is without power to make the order, the Court does not deny that a discrimination which is produced by charging equal rates for unequal service is prohibited by the statute as much as one resulting from unequal rates for equal service. Compare *The Shreveport Case*, 234 U.S. 342, 346. Nor does the Court consider material, in this respect, the findings

---

[1] The distances range from 162 miles from typical points in southern Kansas and 174 miles from typical points in Oklahoma to 213 miles from typical points in northern Texas. Waco is 233, Dallas 291, and Fort Worth 308 miles nearer Galveston than New Orleans.

of the Commission that the rates to Texas ports and New Orleans are both reasonable to shippers, in that the former are not too high, or the latter so low as to cast a burden on other traffic. For it is not denied that the Commission may remove a discrimination effected by rates which are within the zone of reasonableness if the discrimination is one forbidden by § 3 (1) of the Act. *American Express Co.* v. *Caldwell,* 244 U.S. 617; *United States* v. *Illinois Central Ry. Co.,* 263 U.S. 515, 524. It is not suggested that a discrimination effected by reasonable rates may not result in gross injury to the locality discriminated against; and the opinion does not question the correctness of the findings here that such injury is inflicted on the Texas ports by the prohibited rates. The issue is thus narrowed to two questions, first, whether the acts of Congress giving broad powers to the Commission to remove discriminations resulting in undue or unreasonable prejudice to a " locality," have conferred any power on the Commission to curtail an unduly prejudicial discrimination against a port, and second, whether, assuming that the Commission has such power, it may order the removal of the discrimination by the appellant carriers who participate in the discriminatory rates, although their rails reach only New Orleans, and not the Texas ports.

*First.* The Court holds that this power is lacking because the locality injured by the discrimination, a port, is neither the origin nor the ultimate destination of the traffic involved, but a gateway through which it passes, albeit it is arrested there pending its transshipment upon a new and independent contract for ocean transportation. It is said that a gateway is not a "locality" within the meaning of the Act because it was never intended that the statute should forbid discrimination against localities which are not points of origin or ultimate destination, however unreasonable and unjust the discrimination may be.

The words of the statute neither state nor suggest such an exception.

Section 3 (1) of the Interstate Commerce Act declares: "It shall be unlawful for any common carrier . . . to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

Section 15 (1) gives to the Commission plenary power to remove any such "unjustly discriminatory or unduly preferential" individual or joint rate, by ordering the carrier or carriers to cease and desist from the violation, and by prescribing a just and reasonable individual or joint rate to be observed by the carrier or carriers concerned. On its face the prohibition of any undue and unreasonable prejudice to "any particular locality," "in any respect whatsoever," would seem so plainly to include a port as to leave no room for construction. Compare *United States* v. *Shreveport Grain & Elevator Co.*, 287 U.S. 77; *Crooks* v. *Harrelson*, 282 U.S. 55; *Van Camp & Sons* v. *American Can Co.*, 278 U.S. 245, 253.

I can find nothing in the purpose or history of the statute which suggests that it means any less than it says. This Court has often declared that the purpose of the all-embracing language of the statute was to suppress every form of unreasonable discrimination which it was within the power of Congress to condemn. *Merchants Warehouse Co.* v. *United States*, 283 U.S. 501, 512; *Louisville & Nashville R. Co.* v. *United States*, 282 U.S. 740, 749–750; *The Shreveport Case, supra*, 356; *Louisville & Nashville R. Co.* v. *Mottley*, 219 U.S. 467. It has said that discrimination was the principal thing aimed at and "the

purpose of Congress was to cut up by the roots every form of discrimination, favoritism and inequality." *Louisville & Nashville R. Co.* v. *Mottley, supra,* 478.

Statutory language so unambiguous and a purpose so comprehensive do not readily yield to the conclusion that a locality which is a port is not a " locality " within the meaning of the Act. The bare fact that a port is a gateway and not the ultimate destination of the traffic, does not support that conclusion, for the commercial interests of a port, always of great magnitude, may suffer the same destruction from discriminatory rates as do shippers or other industrial interests at points of origin or destination. A rate structure which diverts from one port to another a portion of the ocean-borne traffic, which would otherwise naturally pass through the former, sufficient to destroy the business of banks, marine insurance companies, freight forwarders, freight and ship brokers, stevedores, tonnage companies, pilots, dry docks, ship supply and bunker coal merchants, customs brokers, export and import commission houses, centered there, would seem to have an effect upon the commerce and general welfare of the country of precisely the kind which the act was intended to prohibit and the Commission empowered to prevent. So the Commission has concluded in a series of cases dealing with discrimination against ports, going back to the first years of its existence. See N. Y. Produce Exch. *v.* B. & O. R. Co., 7 I.C.C. 612, 658, 660; In re Export and Domestic Rates, 8 I.C.C. 214; In re Differential Rates, 11 I.C.C. 13; Chamber of Commerce of N.Y. *v.* New York Central, 24 I.C.C. 55, 27 I.C.C. 238; Astoria *v.* S. P. & S. R. Co., 38 I.C.C. 16; In re Import Rates, 24 I.C.C. 78; New York Harbor Case, 47 I.C.C. 643; Mobile Chamber of Commerce *v.* Mobile & O. R. Co., 57 I.C.C. 554; Coffee from Galveston and other Gulf Ports, 58 I.C.C. 716; 64 I.C.C. 26; Charleston Traffic Bureau *v.* Ala. &

G. S. R. Co., 89 I.C.C. 501; Maritime Assn. of Boston v. Ann Arbor R. Co., 95 I.C.C. 539; Oswego v. B. & O. R. Co., 151 I.C.C. 717.

This administrative practice and construction cannot be dismissed with the observation that where " a statutory body has assumed a power plainly not granted no amount of such interpretation is binding upon the court," for the question obviously is whether or not a power was granted which the language of the statute plainly embraces and which certainly was not plainly denied. In determining that question when the meaning of the statute is doubtful on its face, we have often said that administrative construction is of persuasive force, see *United States* v. *Chicago North Shore & Milwaukee R. Co.*, 288 U.S. 1; *N.Y., N.H. & H.R. Co.* v. *Interstate Commerce Comm'n*, 200 U.S. 361, 401, particularly where, as here, the statute has been frequently amended and the provision relied upon retained in identical form. Compare *Brewster* v. *Gage*, 280 U.S. 327, 336; *National Lead Co.* v. *United States*, 252 U.S. 140, 147. This construction certainly cannot be summarily disregarded in favor of another which departs both from the plain meaning of the words and from the policy which has hitherto been thought to have inspired their use.

To support such a departure it is said that as the railroads, before the enactment of the statute, had in some instances attempted to equalize competing ports by setting up a rate structure which did not conform wholly to the carrier service involved, and as Congress, in the Interstate Commerce Act evinced no intention to prevent competition for business between rail carriers, it could not have intended by this legislation forbidding discrimination prejudicial to localities to forbid discriminations between rival ports, however unreasonable and injurious.

The port differentials and equalizations maintained prior to the passage of the original act, in order to secure

a fair distribution of traffic among the Atlantic ports and the carriers serving them, were very different in quality and prejudicial effect upon the localities concerned from the rate structure resulting in the discrimination disclosed here.[2] The existence of those equalizations before 1887 and the fact that in some instances since that date they have been regarded as innocuous even by the Commission itself, can hardly lend support to the supposition that the statute was not intended to forbid destructive discriminations in that form as well as in any other. The argument seems to be that the statute cannot be deemed to forbid unjust discriminations against ports since if it did all rates to competing ports not measured by mileage or carrier service would be forbidden whether unjust or not. With equal plausibility it was argued that because competition between carriers was an established practice before the enactment of § 3 and is not forbidden by the Act, no discrimination induced by carrier competition was forbidden. But that construction was rejected by this Court, *Wight* v. *United States,* 167 U.S. 512, 517; *United States* v. *Illinois Central R. Co., supra; Merchants Warehouse Co.* v. *United States, supra,* for the same reason that the present construction should be rejected—that although carrier competition was not destroyed by the Interstate Commerce Act, it was limited by the prohibition of § 3 of those discriminations which, in the light of all the circumstances, are found to be undue or unreasonable.

---

[2] Differentials were adopted by voluntary agreement of the carriers to eliminate competitive rate wars, ruinous to the railroads, and to the localities concerned. Their effect was to preserve rather than to destroy a fair distribution of the traffic from the west to the Atlantic Seaboard. See John B. Daish, Atlantic Port Differentials (1918); Preferential Transportation Rates, Report of the United States Tariff Commission, 1922, p. 279; cf. Commissioner Prouty, In the Matter of Differential Rates, 11 I.C.C. 13, 61 ff. and the briefs in the same case reprinted in the appendix to the hearings on the Hepburn Amendment before the Senate Committee on Interstate Commerce (1905), Vol. V, p. 407.

The statute does not purport to prohibit all discriminations. It reaches only those against either localities or shippers which result in prejudice which is "undue or unreasonable." Cf. *Nashville, C. & St. L. Ry.* v. *Tennessee*, 262 U.S. 318, 322. Hence, in determining whether a discrimination involved in a port equalization is "undue or unreasonable," competition is a factor which may not be ignored (see *Interstate Commerce Comm'n* v. *Alabama Midland Ry.*, 168 U.S. 144, 170); the Commission is not to leave out of account either past history or practical experience, or the effect of the discrimination on the ports concerned. But even though the exigencies of competition may be entitled to greater consideration in a case of discrimination between ports than in one of discrimination between shippers, the weight which is given to it and to the other relevant facts, in determining whether the discrimination is so unjust as to be forbidden, does not go to the Commission's power but to the propriety of its exercise. *United States* v. *Illinois Central R. Co.*, supra, 525; *Interstate Commerce Comm'n* v. *Alabama Midland Ry.*, supra. That the Commission so conceives its powers and function in considering a rate adjustment equalizing ports, is apparent from its statement of the problem in the present case:

" Such an adjustment necessarily disregards distance and commercial instead of natural advantages control. We have consistently refused to condemn such an adjustment where it is shown to serve the best interests of the public, but where, as here, it builds up one port at the expense of another equally favored by natural advantages from the origin territory here considered, a line must be found beyond which distance may not be disregarded."

This language of the Commission appears to me to suggest the only reasonable interpretation of the statute consonant with its language, its history and its background. The statute does not command or the Commission's order

direct that the rates shall be measured exclusively by mileage or carrier service; carrier competition for business passing through gateways or elsewhere is not forbidden; but when the discrimination goes so far beyond the line of reasonableness as to result in the commercial destruction of a locality, the Commission may declare it "undue or unreasonable" and, therefore, forbidden by the statute, whether aimed at ports or points of shipment or destination. Nothing that this Court has ever said is inconsistent with this conclusion. The legislative history of the statute seems to support, rather than to deny it.

Close scrutiny of the legislative history of the original act and of the Hepburn Amendment fails to disclose any intention to except from the forbidden discriminations against localities, undue or unreasonable discriminations against ports. Senator Cullom, who was in charge of the earlier bill, made no reference to the present question in his explanatory statement,[3] cited in the opinion of the

---

[3] With respect to § 3, Senator Cullom said: "The third section . . . contains a general prohibition of every variety of unjust discrimination. The section covers two subjects. The first paragraph prohibits the giving of any undue or unreasonable preference to any particular person or locality, or any particular description of traffic, in any respect whatever, and declares such a preference unlawful. . . . This covers in general terms, though by no means so completely, the provision of section 2 as to discriminations against persons, but goes further and includes discriminations against localities or particular descriptions of traffic. The language adopted in this paragraph is substantially that of the English statute on the subject which has been repeatedly construed by the English courts, so that its meaning has already been judicially established . . ." (Cong. Rec., 49th Cong., 1st Sess., vol. 17, p. 3472). It may not be without significance that the English antecedents of § 3, The Railway and Canal Traffic Act of 1854 (17 & 18 Vict., c. 31, § 2) and the Act of 1873, amending it (36 & 37 Vict., c. 48, § 11) failed to include preference of localities.

See also Senator Cullom's final answer to Senator Hoar's question whether the effect of § 4 of the proposed act, prohibiting the charging

Court,[4] and none is to be found in the House proceedings to which reference is also made.[5] Senator Cullom emphasized the fact that the discriminations forbidden included those against localities and nowhere suggested any exceptions. Mention in the Report of the Senate Committee of the investigation of a committee of the British Parliament and the quotation of its conclusions,[6] are without significance here. Those conclusions were not endorsed by the Senate Committee and did not deal with undue discriminations produced by railroad competition. It is true that in the debates in Congress on the Hepburn Amendment it was pointed out in several instances that the bill did not confer on the Commission the general

---

of more for a shorter than a longer distance over the same line under substantially similar conditions, would not eliminate port differentials, then in existence, favoring Boston: ". . . if we are going to regulate these corporations at all, if we are going to stop unjust discriminations and the secret rebates by which towns are built up and towns are destroyed, by which individuals are destroyed and individuals are built up, we must have something in the bill which will mean something, or else we might as well lay the bill on the table and go at other business." (Cong. Rec., 49th Cong., 2d Sess., vol. 18, pp. 485, 486.) Compare his statement in discussing the conference report: "It has been said over and over again here that the railroad companies would build up one man and crush another; that their policy has been to destroy one locality or city and build up another. Here we have undertaken to so regulate them as to prevent them from doing those things so far as we can do so." (Cong. Rec., 49th Cong., 2d Sess., vol. 18, p. 660.)

[4] See the opinion of the Court, note 18.

[5] See Cong. Rec., 49th Cong., 1st Sess., vol. 17, pp. 7277, 7294, 7298.

[6] Report No. 46, 49th Cong., 1st Sess., p. 57. Compare the Committee's statement of the fundamental theory and purpose of the bill (p. 215): "The provisions of the bill are based upon the theory that the paramount evil chargeable against the operation of the transportation systems of the United States as now conducted is unjust discrimination between persons, places, commodities, or particular descriptions of traffic. The underlying purpose and aim of the measure is the prevention of these discriminations. . . ."

power to fix differentials to ports or to any other points,[7] but it was also pointed out that " Section 3 of the original act applies just the same. We have not undertaken to amend, limit, or extend Section 3. Whatever is unjust and discriminatory under Section 3 is unjust under the provisions of this bill and such will be prohibited . . ."[8] Moreover the basis for this want of power to fix differentials was not that a port is not a " locality " within the meaning of § 3, but that differential rates on different roads cannot be fully controlled without the fixing of a minimum rate.[9] And it was recognized in the decisions of

[7] See Cong. Rec., 59th Cong., 1st Sess., vol. 40, pp. 1788, 2084-5, 2247, 2248, 3792, 6683.

[8] For the full quotation, see note 9, *infra*.

[9] Compare the statement of Mr. Stevens, a member of the House Committee: "My people are just as much interested that there should not be any undue control of differential rates. . . . But it is just as clear to us and to the whole committee that there is no such power in this bill. . . . The situation presented by the bill and the reasons why differentials are not covered are very simple. Under this bill the Commission would have authority to fix what, in its judgment, would be a just, reasonable, and fairly remunerative rate or rates as the maximum to be charged. It would have no authority to fix an absolute rate, which must be observed by the carrier, and no authority to fix a minimum rate, below which the carrier cannot go; and a preferential cannot be controlled without there is authority to control absolutely both legs of the differential. In this case the Commission cannot control either. It must fix a rate which shall be just and reasonable and fairly remunerative as the maximum to be charged. This leaves the carrier to charge anything it pleases below the maximum. And since there is no power to fix any absolute rate and no minimum rate, there is no power in the Commission to control the relation of rates, and so no power to control the differential." Mr. Olmsted then asked whether " under this bill the railroads may make as many unjust discriminations as they please and the Commission would be powerless to correct them." Mr. Stevens answered: "Oh, no; . . . Section 3 of the original act applies just the same. We have not undertaken to amend, limit, or extend section 3. Whatever is unjust and discriminatory under sec-

this Court prior to the enactment of Transportation Act, 1920, conferring the power to fix minimum rates, that unjust discriminations produced by the relation of rates charged or participated in by the same carrier might be forbidden by the Commission by lowering the higher rate, (compare *St. Louis S. W. Ry. Co.* v. *United States*, 245 U.S. 136, 144) or by an order which left the carrier free to raise or continue the lower rate; "the compulsion being that if the low rate is retained the rate applicable to the locality or article discriminated against must be reduced." *Skinner & Eddy Corp.* v. *United States*, 249 U.S. 557, 566.

*Second*. The Court also holds that even if a port is a "locality" within the meaning of the statute, and prejudicial discriminations against it are forbidden, still the Commission is without power to order the Texas & Pacific R.R. Co. and the Louisiana Railroad & Navigation Com-

---

tion 3 is unjust under the provisions of this bill, and such will be prohibited; but we will not allow the making of a minimum or absolute rate, which is the only adequate way of controlling a differential." Cong. Rec., vol. 40, p. 2085. It does not appear that Mr. Mann's statement (Cong. Rec., vol. 40, p. 2247) quoted by the Court (note 20) was intended to have any different meaning. Indeed his reference to ports and to "cities" would seem to indicate that he did not believe that ports were in any different position with reference to differentials than points of origin or destination. See also Cong. Rec., vol. 40, p. 3792, and compare the remarks of Senator Lodge, Cong. Rec., vol. 40, p. 4111, which indicate, if anything, his belief that the differentials between Boston and other Atlantic ports were within the control of the Commission.

It was also pointed out that relative rates on *different* roads were not within the control of the Commission. In discussing differentials, Senator Raynor pointed out that the provisions of the bill "are limited to discriminations upon the same roads. The words 'unjustly discriminatory' or 'unduly preferential' or 'prejudicial' apply to rates and regulations and practices upon the same road, because there can be no such thing as an unjust discrimination or an undue preference between different roads supplying different territory and terminating at different points. . . . If one road charges an un-

pany to remove the discrimination. Both these lines reach New Orleans with their own rails and both participate in through rates and a full line of joint rates between local and junction points on their own lines and the Texas ports. They thus control the rate to New Orleans and are parties to rates to the Texas ports and to the prejudicial discrimination. Nevertheless, it is said that the Commission is without power to make an order removing the discrimination which does not afford to the carriers an alternative method of removing it, either by lowering the rates to the Texas ports or raising those to New Orleans, and that the present order does not afford such an alternative because of the appellants' inability to control the rates to the Texas ports.

The Commission may, in directing the removal of a discriminatory rate or practice, not otherwise objection-

---

reasonable rate or a discriminating rate, that would surely not justify the Commission's adjusting the rate between this road and some other road *that has no connection with it by law or privity of contract.* . . ." (Cong. Rec., vol. 40, p. 6683.) Read in the light of this statement, there is nothing to support the conclusion of the Court in the other statement of Senator Raynor referred to in the opinion (note 20) that there is no "power whatever in the Commission to adjust relative rates and strike the proper proportions between them. The ports of the United States, therefore, are not within the jurisdiction of the Hepburn Act. If there is a differential between different ports upon different lines of railroads, there is no provision in this measure that invests the Commission with the right to change it. It has a perfect right, of course, where discrimination exists upon the same line, as if a rate to an inland point compared with a rate to a terminal point is unreasonable or unjustly discriminatory, to prescribe a maximum rate; but it has no right to bring competitive roads struggling for competitive markets within its jurisdiction, and I deny in its entirety the proposition that the Commission could by any exercise of its power, direct or inferential, take away from any railroad its right to charge its own rates, unless the rate is unreasonable or unduly preferential or discriminatory upon its own line." (Cong. Rec., vol. 40, p. 3792.)

able, allow to the carrier a choice of methods of removing the discrimination by the modification of one rate or practice or the other. By the present order the two carriers are left free to remove the discrimination by raising the New Orleans rate which they control, or by entering into lower joint or through rates with the connecting carriers to the Texas ports—a latitude which may serve the interest of the carriers better than would an order specifically directing them to raise the New Orleans rates. Beyond question these roads can remove the discrimination by raising the New Orleans rates and it neither appears, nor is it argued, that they cannot remove it by lowering the rates to the Texas ports by agreement with their connecting carriers or, in default of agreement, by reducing their own division and securing a corresponding reduction of the joint rate on application to the Commission under § 15 (6). See *St. Louis Southwestern R. Co.* v. *United States,* 245 U.S. 136, 139, note 2; compare *United States* v. *Illinois Central R. Co., supra,* 521.

But the statute does not compel the Commission to afford such an alternative or permit an offending carrier to avoid its salutary provisions merely for the reason that, although participating in both the offending rates, it can with certainty control only one. It is true that in cases arising before the enactment of Transportation Act, 1920, by which power was given to the Commission to fix a minimum rate, it could not remove a discrimination by prescribing a minimum rate to one of the competing localities. But it could remove the discrimination by imposing a lower maximum rate, even though a joint rate participated in by the carrier whose rails did not reach the locality discriminated against, (compare *St. Louis Southwestern Ry. Co.* v. *United States, supra*) or, as already mentioned, it could leave the carriers free to remove the discrimination by raising one or lowering the other. See *American Express Co.* v. *Caldwell, supra,* 624; *United*

*States* v. *Pennsylvania R. Co.*, 266 U.S. 191. And now that the Commission has power under § 15 (1) to fix a minimum rate it may equally command the removal of the discrimination by directing a rate to be raised, just as where the carrier maintains discriminatory practices the Commission may direct the modification of one and not the other, and is not bound to allow the carrier a choice. *Merchants Warehouse Co.* v. *United States, supra,* 513; *New York, New Haven & Hartford R. Co.* v. *Interstate Commerce Comm'n, supra,* 404. The fact that the Commission has given to the carrier an option to remove the discrimination by arrangement with the connecting carriers, through which the traffic reaches the Texas ports, does not afford to the carrier any ground for complaint, or impair the power of the Commission to make the order.

The situation here appears to be identical with that presented to this Court in *United States* v. *Illinois Central R. Co., supra,* and in *St. Louis Southwestern Ry. Co.* v. *United States, supra.* In both cases the carriers' rails reached one of the competing points only through its connections. In the first the order leaving the carrier free to remove the discrimination by raising one rate or lowering the other, and in the second an order requiring the carrier to remove the discrimination by establishing a lower joint rate with its connections, was upheld by this Court. In *St. Louis Southwestern Ry. Co.* v. *United States,* this Court said, page 144:

" Carriers insist also that the order is void on the ground that, since their ' rails do not reach Paducah, they cannot be guilty of discrimination against that city.' They, however, bill traffic via Cairo or Memphis through to Paducah in connection with the Illinois Central, thus reaching Paducah, although not on their own rails. And, thereby, they become effective instruments of discrimination. Localities require protection as much from combinations of connecting carriers as from single carriers whose ' rails '

reach them. Clearly the power of Congress and of the Commission to prevent interstate carriers from practicing discrimination against a particular locality is not confined to those whose rails enter it."

The judgment should be affirmed.

The CHIEF JUSTICE, MR. JUSTICE BRANDEIS and MR. JUSTICE CARDOZO concur in this opinion.