The NEW YORK CENTRAL RAILROAD COMPANY, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and Baltimore and Ohio Railroad Company, Western Maryland Railway Company, Canton Railroad Company, Maryland Port Authority, Baltimore Association of Commerce, The Delaware River Port Authority, and The City of Philadelphia, Intervening Defendants.

ERIE–LACKAWANNA RAILROAD COMPANY and The Port of New York Authority, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

and Baltimore and Ohio Railroad Company, Western Maryland Railway Company, Canton Railroad Company, Maryland Port Authority, Baltimore Association of Commerce, The Delaware River Port Authority, and The City of Philadelphia, Intervening Defendants.

United States District Court
S. D. New York.
June 27, 1962.

H. Neil Garson, Washington, D. C.
(Robert W. Ginnane, Washington, D. C.,
of counsel), for Interstate Commerce
Commission, defendant.

Robert M. Morgenthau, U. S. Atty.,
by Arthur S. Olick, New York City (Lee
Loevinger and John H. D. Wigger, Wash-
ington, D. C., of counsel), for United
States of America, defendant.

William L. Marbury, Baltimore, Md.,
Franklin G. Allen, Karl J. Grimm, Balti-
more, Md. (Donald M. Dunn, New York
City, Jervis Langdon, Jr., Charles J. Hen-
ry, Jr., J. Crossan Cooper, Jr., William
C. Purnell, Paul S. Sarbanes, Baltimore,
Md., Donald Macleay, Washington, D.
C., of counsel), for The Baltimore and
Ohio Railroad Company, Western Mary-
land Railway Company, Canton Railroad
Company, Maryland Port Authority, and
Baltimore Association of Commerce, in-
tervening defendants.

Mortimer B. Wolf, New York City,
Lewis Kates, Philadelphia, Pa. (David
Berger, Philadelphia, Pa., William C.
Burt, Robert M. Beckman, Washington,
D. C., of counsel), for The City of Phil-
adelphia, intervening defendant.

Warren Price, Jr., Washington, D. C. (White & Case, New York City, Morris Duane, Francis W. Sullivan, Philadelphia, Pa., Bruce A. Wallace, Camden, N. J., of counsel), for The Delaware River Port Authority, intervening defendant.

Samuel H. Moerman, Washington, D. C. (M. C. Smith, Jr., J. T. Clark, Cleveland, Ohio, Sidney Goldstein, New York City, F. A. Mulhern, Newark, N. J., and Patrick J. Falvey, New York City, Arthur L. Winn, Jr., J. Raymond Clark and James M. Henderson, Washington, D. C., of counsel), for Erie-Lackawanna Railroad Company and The Port of New York Authority, plaintiffs.

Richard J. Murphy, Chicago, Ill., Gerald E. Dwyer, New York City (George J. Schwarz, Robert D. Brooks, New York City, of counsel), for The New York Central Railroad Company, plaintiff.

Before FRIENDLY, Circuit Judge, and METZNER and FEINBERG, District Judges.

FRIENDLY, Circuit Judge.

In these two actions, brought under 28 U.S.C. §§ 1336, 2321–2325, plaintiffs (sometimes hereafter referred to as "the New York interests") seek to enjoin the enforcement of an order of the Interstate Commerce Commission, made on June 15, 1961, in I. & S. Docket No. 6074, Iron Ore from Eastern Ports to Central Freight Association Points, 314 I.C.C. 149, insofar as the order directed the New York Central and the Erie-Lackawanna (hereafter the Erie) to cancel tariffs that would have reduced the rates on import iron from New York to steel producing points in the Youngstown, Ohio, area, from $5.33 to $3.92 per ton, the rate then charged from Baltimore and Philadelphia.[1] Railroads serving Baltimore and other Maryland parties (hereafter the Baltimore interests) and the City of Philadelphia and the Delaware River Port Authority (hereafter the Philadelphia interests) have intervened as defendants in support of the validity of the order.

It will be necessary, as we proceed, to refer to earlier phases of this case, going back to 1953. However, we shall not narrate this history at length since it can all be found in 291 I.C.C. 527 (1954), 299 I.C.C. 195 (1956), 151 F.Supp. 258 (D.Md.1957), 355 U.S. 175, 78 S.Ct. 189, 2 L.Ed.2d 183 (1957), and our own opinion on a motion for transfer under 28 U.S.C. § 1404(a), 200 F.Supp. 944 (1961).

The controversy stems from the increase in the dependence of the United States on imports of iron ore,—these having grown from 2,500,000 tons annually before World War II to 33,500,000 tons in 1957. More than two-thirds of these imports have moved through Baltimore and Philadelphia, although about half of the movement through these ports seems to proceed no further than the Bethlehem Steel plant at Sparrows Point, Md. and the United States Steel plant at Fairless, Pa. The ore comes from widely scattered foreign areas—Labrador, Venezuela, Liberia, and others. The traffic through New York has been negligible; the port has no modern ore piers. The Port of New York Authority has made studies of sites on the New Jersey side of the Hudson at which a modern ore pier could be constructed. However, the Commission's report states, 314 I.C.C. at 161, and the Port Authority's brief confirms, that construction of a modern ore-unloading facility at New York must be preceded by rate parity with Baltimore and Philadelphia.

According to the Commission's report, 314 I.C.C. at 163, the distances to Youngstown over the rail routes by which the traffic would move are as follows:

| Port | Miles |
|---|---|
| Baltimore | 391.9 |
| Philadelphia | 427.4 |
| New York | |
| via Erie | 588. |
| via New York Central | 620. |

The New York interests assert, and no one seriously questions, that a low-

---

1. The briefs inform us that the $3.92 per ton rate has now been increased to $4.03, Increased Freight Rates, 1960, 311 I.C.C. 373 (1960).

grade commodity such as iron ore will not normally move through a port whose aggregate transportation costs to the consignee are higher than those of another that is equally available. They say that the historic differentials in import and export rail rates against New York and in favor of Philadelphia and Baltimore, originating more than eighty years ago, were established against a background wherein "the ocean rates for freights to and from foreign markets were less from and to New York than from and to the other ports, and the effort was to equalize the entire through charge via the several ports," Chamber of Commerce of the State of New York v. N. Y. C. & H. R. R. Co., 24 I.C.C. 55, 69 (1912). See In the Matter of Differential Freight Rates, to and from North Atlantic Ports, 11 I.C.C. 13 (1905). The New York interests have contended in another case, relating to general cargo, Equalization of Rates at North Atlantic Ports, 311 I.C.C. 689 (1960), 314 I.C.C. 185 (1961), order enjoined, Boston & Maine R. R. v. United States, 202 F.Supp. 830 (D.Mass. 1962), now on appeal to the Supreme Court, as they did here, that the reason for the export and import rail differentials ceased when the water differentials ceased, and, indeed, that the very principle of rate equalization between interior United States points and foreign ports which was the basis of the port differentials [2] now requires their abolition. See New York Cent. R. Co. v. United States, 99 F.Supp. 394 (D.Mass.), aff'd, 342 U.S. 890, 72 S.Ct. 201, 96 L.Ed. 667 (1951).

The factual contentions of the New York interests as to ocean freight rates on import iron ore are not seriously disputed. We take the basic factors to be as stated in the earlier report of the Commission, 299 I.C.C. at 198:

"Iron ore now moves in both chartered vessels and vessels owned by the steel companies. Some of the traffic moves under voyage charters, which are charter agreements covering a single voyage at a specified price, and a part moves under time charters, which are charter arrangements whereby the operator puts the vessel fully manned, equipped, and supplied, except for fuel, at the disposal of the shipper for a specified period. Since 1920, ocean rates generally have been equalized with respect to voyage charters to all the North Atlantic ports. In some circumstances, however, there is a saving of cost to the shipper in routing ore to the North Atlantic port nearest to the port of origin. This might be true on a time charter arrangement or for an integrated shipper."

A tabulation on the same page shows that, save as to Labrador, there are no significant differences in the ocean distances from major iron producing areas abroad and New York, Philadelphia and Baltimore. Although the portion of the instant report dealing with the New York rates makes no findings on the subject of ocean freight costs, the portion dealing with the Phildelphia rates states that "from countries other than Canada" ocean costs are the same "on movements of iron ore to any port within the North Atlantic range, which includes all ports north of Cape Hatteras, N. C.", 314 I.C.C. at 158–159. Hence it would appear that, except for Labrador ore, the bulk of which is expected to move in the future via the St. Lawrence Seaway, opened in April, 1959, the ocean charges to the three ports are substantially the same, and that continuation of any appreciable rail rate differential to interior steel producing points will effectively prevent New York from participating in this important movement. In this respect the case differs significantly from the companion proceeding relating to general cargo, mentioned above, where

2. The Thurman Advisory Commission of 1882 recommended the differentials on the basis of "the great principle which compels the carriers of property competing between the same points and offering equal facilities to their customers to make the same rates." 311 I.C.C. at 744.

the record showed a preponderant movement through the northern ports despite the differentially higher rail rates and correspondingly higher over-all freight rates to and from interior points.

Initially the contention that the New York carriers should be allowed to equalize the rates on import iron ore proved persuasive to a majority of the Commission, 299 I.C.C. 195.[3] Although the order permitting the reduced rates for New York was enjoined by the District Court for Maryland, 151 F.Supp. 258 (1957), the Supreme Court's per curiam opinion, 355 U.S. 175, 78 S.Ct. 189, 2 L.Ed.2d 183 (1957), on the appeals of the New York and Philadelphia interests, seems to have relieved the Commission of any mandate in that regard.[4] However, the Commission, after the remand, although adhering to its former conclusion with respect to Philadelphia, altered that with respect to New York and directed cancellation of the reduced New York rate.[5]

The Commission concluded, 314 I.C.C. at 168, (1) "that a rate on import iron ore from New York to the Youngstown area the same as that from Baltimore or Philadelphia to the same area would un-duly prefer New York and unduly prejudice Baltimore and Philadelphia"; and (2) "that the proposed rate from New York is not shown to be just and reasonable."[6] To us this means that the Commission, being empowered in this suspension proceeding under § 15(7), 49 U.S.C.A. § 15(7) to "make such order with reference" to a proposed rate "as would be proper in a proceeding initiated after it had become effective", § 15(1), found the proposed rates discriminatory under § 3 and unreasonably low under § 1 (5) of the Interstate Commerce Act. One would have supposed that, particularly in view of the long history and importance of the case, a remand directed by the nation's highest tribunal, and a reversal of the result previously reached on the issue here in question, the Commission would have supported these conclusory statements by detailed findings and considered explication of the path from findings to conclusion. Instead the conclusions are supported only by an analysis of the costs of the New York Central and the Erie which we discuss below and by three paragraphs of

---

**3.** The vote was 6–4, with one of the six believing that parity should also be extended to Boston. A suit by the Boston interests to enjoin so much of the order as refused to permit parity from Boston was dismissed on the basis that the proposed rate was not shown to cover out-of-pocket costs as defined by the Commission, Boston & Maine R. R. v. United States, 153 F.Supp. 952 (D.Mass. 1957).

**4.** The District Court had directed more explicit findings by the Commission with respect to parity between Philadelphia and Baltimore. The Supreme Court manifested no disapproval of this action. However, since "it is not precluded that the Commission may find an interrelationship, within the purview of the National Transportation Policy, supra, among lawful tariffs to be established between these three ports and the 'differential territory'", the Court thought it "appropriate that, in reconsidering the relationship between the Philadelphia and Baltimore schedules pursuant to the remand of the District Court, the Commis-sion should be free to reconsider and take action upon the New York schedules", 355 U.S. at 178, 78 S.Ct. at 191, and vacated the District Court's order to that end. Although much gossamer can be and has been spun over this and the succeeding sentence of the Supreme Court's opinion, it is at least plain that the Court expressed no approval of the views of the District Court, 151 F.Supp. at 278, that parity for New York was precluded by greater distance, by the ability of the Baltimore carriers to obtain a greater yield at a lower rate, or by the fact that, as said by the dissenting Commissioners, the proposed rates from New York were "bottomed solely on the desire to meet the competition of Philadelphia and Baltimore." If the Court had thought these considerations necessarily precluded parity for New York, it would have affirmed rather than vacated this portion of the District Court's order.

**5.** This time the vote was 7–1.

**6.** Commissioner Freas joined only in the latter conclusion.

the report which, for convenient reference, we quote in full in the margin.[7]

### Section 3.

■ Neither the New York Central nor the Erie serves Baltimore or Philadelphia by its own rails. If they did not serve these ports in any other manner, no conclusion of violation of § 3 would be warranted. It has been recognized for seventy years that Carrier A does not violate § 3 simply by offering a lower rate than Carrier B's to a common point for the same distance, or the same or a lower rate for a longer distance, so long as Carrier A has no single-line rate and is not a party to a joint rate to the common point from the point served by Carrier B.

As was said in Eau Claire Board of Trade v. Chicago, M. & St. P. R. Co., 5 I.C.C. 264, 295 (1892), "It would be quite absurd to charge a railroad with giving preference or advantage to a community which it does not serve, and it is equally illogical to say that it can prejudice or discriminate against such a community." We do not read the Supreme Court decisions cited below as altering this venerable principle.

■ However, inquiry elicited that the New York Central and the Erie are parties to joint rates between Baltimore and differential territory. Many cases, beginning with the Commission's decision in Ashland Fire Brick Co. v. South-

7. "New York attracts more of the highly desirable general-cargo tonnage vital to its port economy than all other North Atlantic ports combined. To obtain a volume of traffic which will support a much lower level of port activity and range of shipping services than New York, Baltimore depends heavily on bulk-cargo tonnage, which is peculiarly sensitive to transportation cost. Equalization of Rates at North Atlantic Ports, 311 I.C.C. 689, decided December 5, 1960, as modified by our order of March 7, 1961, and, report on reconsideration, 314 I.C.C. 185, decided June 15, 1961. As stated therein, general-commodity traffic extensively uses New York, among other reasons, because of its facilities for more frequent direct sailings. With rate parity and the construction in the New York Harbor area of the proposed modern ore pier, much of the iron ore traffic would be diverted from Baltimore. Thus, in addition to the loss of the Labrador iron ore to the St. Lawrence Seaway, Baltimore would lose, to New York, much of the traffic which originates in other foreign countries.

"Although rail costs of operation from Baltimore and Philadelphia to the destination area are not of record, the greater distances to Youngstown from New York of 620 miles (New York Central) and 588 miles (Erie), as compared with the average of 391.9 miles from Baltimore and 427.4 miles from Philadelphia, strongly support a conclusion that the cost of service on this traffic from New York is substantially greater than that from Baltimore or Philadelphia. Thus, the record leaves us with no doubt that the Baltimore and Philadelphia carriers can economically maintain lower minimum rates than the New York carriers on this traffic. In these circumstances, and absent an overriding necessity of national defense importance, a reduction in the present New York rate to the Baltimore basis, as proposed, might and probably would result in a destructive rate war, with the rates gravitating to their lowest possible level, and in a needless dissipation of carrier revenues. As stated in Equalization of Rates at North Atlantic Ports, supra, we have been given the power to fix rates, among other reasons, for the purpose of preventing destructive competition and promoting the financial stability of regulated carriers. Failure to observe our obligation in the exercise of that power would find us remiss in our duties.

"In the prior report we observed that iron ore not only is of importance to the carriers in that it can and should reasonably bear its full share of the transportation burden, but that it is of vital importance to the national defense, and that the carriers should be permitted, within lawful bounds, to establish rates which will permit the movement of this traffic through several ports. The record is meager on this phase of the case. So far as appears, there is no indication that the present facilities for handling iron ore at the North Atlantic ports are, or within the foreseeable future will be, in any respect inadequate for the national defense, and we have no reason to believe that restriction of rate parity to Baltimore and Philadelphia will have any material effect upon the national defense. If the situation should change, the matter can be promptly reconsidered." 314 I.C.C. at 163–164.

ern Ry. Co., 22 I.C.C. 115, 119–120 (1911), and culminating with the Supreme Court's in Texas & Pacific Ry. Co. v. United States, 289 U.S. 627, 649–650, 53 S.Ct. 768, 77 L.Ed. 1410 (1933), held that even under such circumstances no order could be made under § 3 unless the carrier against which the order was directed "controlled" the joint rate. But we are satisfied that the combined effect of New York v. United States, 331 U.S. 284, 340–343, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947), and Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 593–594, 69 S.Ct. 278, 93 L.Ed. 243 (1949), is to validate Mr. Justice Stone's statement, dissenting for the Chief Justice, Mr. Justice Brandeis, Mr. Justice Cardozo and himself, in Texas & Pacific, 289 U.S. at 669, 53 S.Ct. 768, that the "control" requirement exists only when the Commission issues an "alternative order" requiring the removal of discrimination and not when, as here, it uses the minimum rate power against carriers which are parties to the two rates claimed to be discriminatory.

Where the Commission's order fails under § 3 is thus not in lack of legal power but in the want of adequate supporting findings. The subsidiary findings relied on to support the conclusion of undue preference and prejudice and consequent violation of § 3, as distinguished from those relating to an unduly low rate and consequent violation of § 1 (5), are only that the distances (and, inferentially, costs, although there were no detailed studies on this) from Baltimore and Philadelphia are less than from New York, and that equality of the rail rates from New York would divert iron ore traffic from Baltimore which is more dependent on such traffic than New York.

■ It is undeniable that unlawful discrimination can be effected as readily by giving more transportation for the same price as by charging a higher price for the same transportation. See Commissioner Eastman in A. C. Dutton Lumber Corp. v. N. Y., N. H. & H. R. Co., 151 I.C.C. 391, 415 (1929); Mr. Justice Stone in Texas & Pacific Ry. Co. v. United States, 289 U.S. at 656, 58 S.Ct. 768. However, the Commission has never adopted a doctrinaire position that any failure to bring rail charges into exact accord with differences in distance is a preference or prejudice, much less an undue one. One reason is that although distance must have some effect on rail transport costs, the relationship is by no means direct. Even on transportation in the same direction over the same line, a heavy proportion of total costs is represented by originating and terminating expenses, as well as overhead expenses, such as accounting, which do not vary with mileage. When different carriers are involved, still other factors enter into the comparison. Neither has the Commission ever insisted that rates to or from competing markets or ports should cover cost by precisely the same margin. Hence the fact that differentials based on longer mileage and higher cost may not be an undue prejudice to the higher rated port has never been thought to mean, in and of itself, that equalization would unduly prejudice the formerly lower rated one.

In no area has the Commission taken a less rigid attitude in requiring precise adjustment of rates to distance or even to costs than with respect to rates on import and export traffic. We shall limit our discussion to a few of the many decisions that could be cited: In an early case the Commission stated that "to decree that traffic should always move by the cheapest route would be to entirely eliminate competition, which, within reasonable bounds, is for the interest of the general public," In the Matter of Differential Freight Rates to and from North Atlantic Ports, 11 I.C.C. 13, 76 (1905). Much later, in Maritime Assn. of Boston Chamber of Commerce v. Ann Arbor R. Co., 95 I.C.C. 539, 569 (1925), the Commission expressed the view that "Having in mind the special circumstances and conditions which surround export traffic, the general practices of carriers with respect to such traffic, and the relative insignificance of the differences in total lengths of haul, these differences in dis-

tance might well be ignored in the case of the through export rates on grain and grain products applicable from all points in western territory to the north Atlantic ports", see also Wool Rates Investigation, 1923, 91 I.C.C. 235, 260 (1924); in the same case the Commission found that the greater distance from Buffalo to Boston, some 17.4% in the case of Baltimore and 11.2% in the case of Philadelphia, did not require higher export ex-grain rates to Boston, especially when it was considered that the rail rates were for "portions of much longer total hauls," 95 I.C.C. at 570–572. Four years later, in denying an increase in the differential sought by Baltimore, the Commission again questioned the desirability of requiring a close adjustment of port rates to costs: "To attempt to do so is to ignore the best interests of the carriers, the ports, and particularly the shippers, it being of prime importance to the latter that they have as many routes to each port and as many ports as possible available for their traffic, which they can not have if rates are to be made so as to yield substantially the same profit to each carrier or group of carriers for particular services," Baltimore Chamber of Commerce v. Ann Arbor R. Co., 159 I.C.C. 691, 696 (1929). Even the order that gave rise to the Texas & Pacific case equalized rates on a number of bulk products and prescribed differentials only on specified commodities where the difference in distance was 25% or more, Galveston Commercial Assn. v. Galveston, H. & S. A. R. Co., 128 I.C.C. 349 (1927). With this background it was not unnatural that when Congress amended § 3 to include "ports", thereby overruling the Texas & Pacific holding that "localities" as used in § 3 did not include ports, 49 Stat. 607 (1935), the House Committee on Interstate and Foreign Commerce stated the amendment was intended to "afford competing ports a forum in which to complain of rate adjustments which tend to concentrate the movement of the traffic through one port or a limited number of ports and to deprive other ports of an opportunity to handle a part of such traffic" and to "encourage and promote the freedom of movement of export, import, and coastwise commerce through the ports of the country", the committee thinking it "to the interest of the public that such commerce be permitted to move freely through as many available ports as the governing circumstances will reasonably permit, and that no restrictions upon and impediments to the free movement thereof should be imposed that are not clearly shown to be sound or economically justified", H.R.Rep. No. 1512, 74th Cong., 1st Sess. 2 (1935).

Until recently the decisions reflected an approach consistent with the House Committee's views. In State of New Jersey v. Baltimore & Ohio R. Co., 245 I.C.C. 581, 593 (1941), the Commission refused to find that equal import and export rates unduly preferred New York points and unduly prejudiced New Jersey points within New York harbor although, as stated in Commissioner Eastman's dissent, the extra costs, of $1.30 per ton, incurred in lighterage to and from the former was equivalent to 80% of the charge for hauling a ton of coal 172 miles from Pittsburgh to Lake Erie ports. In Port of New York Authority v. Baltimore & Ohio R. Co., 248 I.C.C. 165 (1941), the Commission refused to find a differential of Baltimore and Philadelphia under New York on ex-lake grain from Buffalo unduly prejudicial, although the New York mileages were generally less, pp. 172–173. Citing the House Committee report on the 1935 amendment, the Commission said, p. 180, that New York's contention "would practically freeze the rate structure of the country upon a distance basis, and would prohibit manufacturing centers from competing in a common market upon any but rates made strictly on distance and other existing transportation conditions. We do not agree with any such concept of the law." When the Commission later refused, 278 I.C.C. 31 (1950), to allow the northern carriers to equalize rates on export ex-lake grain from Buffalo to Portland, Boston and New York with

those to Baltimore and Philadelphia, because of greater distances to Portland and Boston and higher terminal costs at New York, its order was enjoined, New York Cent. R. Co. v. United States, 99 F.Supp. 394 (D.Mass.), aff'd, 342 U.S. 890, 72 S.Ct. 201, 96 L.Ed. 667 (1951); on remand the Commission not only permitted the carriers serving Portland, Boston and New York to reduce their rates but refused to allow the Philadelphia and Baltimore carriers to restore the differentials by a further reduction, 292 I.C.C. 647, 651 (1954), saying that "Equalization of the through charge * * * had been considered an important principle in previous efforts to deal with this * * * matter of differentials, * * * and the theory that each port should have the inland rate to which its location entitled it was rejected since, as pointed out therein, the export traffic did not stop at the seaboard." Even in its report forbidding equalization of general cargo rates at North Atlantic ports, 311 I.C.C. 689 (1960), which the District Court for Massachusetts has enjoined, 202 F.Supp. 830, the Commission conceded "that considerable disregard of rail distances is characteristic of all port adjustments", pp. 715–716, and that the distance disadvantages of the northern tier ports "are much less than the substantial differences in distances to and from some other ports which have a parity or near parity of rates, including the Canadian ports, and the wide differences which obtain where the several South Atlantic and Gulf ports are equalized," p. 715. Finally, the Commission's prior report in this very proceeding, 299 I.C.C. 195, necessarily determined that equal rates from New York were not then regarded as violating § 3.

■ We do not say that these past pronouncements bind the Commission forever and that it may not lawfully adopt a policy that equalization of import rates for interior distances differing as significantly as here violates § 3, even though, as a result of equal ocean rates, this will mean that certain ports will be totally excluded from important categories of traffic. Section 3 is a broad charter, giving the Commission wide latitude of definition. If the Commission has reached the considered conclusion that present conditions in the railroad industry demand a closer correspondence of rates to costs, so that departures from a uniform relationship, which have previously been tolerated or even encouraged to promote port competition, shall now be deemed "undue or unreasonable", it is free to say so. But we cannot find in the instant report, whether we read it by itself or in conjunction with that in the general cargo case, either any such general pronouncement or any sufficient statement of reason why the Commission here departed from a construction of § 3 to which it has generally adhered for more than half a century and has previously applied to these very rates. Before we can sustain a conclusion of violation of § 3, the Commission must explain it with a clarity and make supporting findings with a specificity beyond the instant report. Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954).

### Section 1(5)

Defendants, although not disclaiming reliance on § 3, place primary reliance on § 1(5), to which, indeed, the whole of the Commission's discussion of "The rates from New York", 314 I.C.C. at 161–164, seems to be devoted.

The report begins with an analysis of costs. In the prior proceeding, 299 I.C.C. 195, when the New York carriers were proposing a rate of $3.035 per ton, the Erie, but not the New York Central, submitted studies "based on the costs directly associated with the services to be performed and on the system freight operating expenses, rents, and taxes for 1953, which were first separated so as to obtain the out-of-pocket portion." 299 I.C.C. at 205. This separation was performed by a complex statistical process, using the so-called Rail Form B and involving separate regression analyses for various expense accounts, described in New Automobiles in Interstate Commerce, 259

I.C.C. 475, 499–502 (1945); see also Meyer, Peck, Stenason and Zwick, The Economics of Competition in the Transportation Industries, Chapters II and III and Appendix A. After making various adjustments the Commission concluded that $2.647 per gross ton approximated what it terms "out-of-pocket costs" of the Erie from New York;[8] it was partly because of this that the Commission sanctioned the $3.035 rate from New York then proposed, at the same time that it directed cancellation of the same rate from Boston whence the "out-of-pocket" costs were found to be $3.42.[9]

At the hearing on remand, new cost studies for the Erie and the Central were introduced. The evidence as to "out-of-pocket" cost per ton of iron from New York to Youngstown, 314 I.C.C. at 162–163, 171–175, is as follows:

|  | (1)<br>Carriers' studies<br>(as revised)* | (2)<br>Protestants' studies ** | (3)<br>Commission's initial restatement ** | (4)<br>Commission's further restatement *** |
|---|---|---|---|---|
| Erie | $2.79 | $4.11 | $3.20 | $3.25 |
| N.Y.C. | 3.17 | 4.61 | 3.86 | 3.92 |

*Based on expenses for 1957 adjusted to reflect increase in train crew wages as of November 1958.

**Adjusted to reflect price levels as of July 15, 1958.

***Adjusted to reflect increased wage and material costs as of December 31, 1958.

The spread between the costs developed in the carriers' and in the Commission's studies is due not only to the different periods noted but also to the fact that the carriers' studies employed the percentages of variability of expenses in different categories used at the initial hearings (Rail Form B), whereas the Commission adopted its Rail Form A which takes "rail operating expenses, rents, and taxes * * * as being 80 percent variable for the purpose of rail cost studies." I.C.C. Bureau of Accounts, Cost Finding and Valuation, Explanation of Rail Cost Finding Procedures and Principles Relating to the Use of Costs (1954), 86. The Central criticizes this latter adjustment which, it says, increased out-of-pocket costs by 31.6¢ per ton, a contention which, if borne out, might show out-of-pocket costs to be covered by so wide a margin as perhaps to create doubt as to the Commission's legal power to find the rates unreasonably low.

The Central's claim is that the differing percentages of variability in different expense accounts used in its studies are more accurate in determining the costs of a particular movement than a uniform figure, however useful the latter may be for rough-and-ready application. The Commission answers that the 80% figure is itself derived from long study of the behavior of the various expense accounts, see Explanation of Rail Cost Finding Procedures and Principles Relating to the Use of Costs, supra, at 86–87, which, as the Commission points out, is approximately 15 years more recent than the study underlying Form B. The higher "out-of-pocket" costs shown by Form A may well be due to the fact that more recent data and thinking rec-

---

8. The term "out-of-pocket costs", as now used in railroad parlance, refers to "long term out-of-pocket costs" which include much more than a layman might think from the description, see New York N. H. & H. R. Co. v. United States, 199 F.Supp. 635, 640 & fn. 11 (D.Conn.1961).

9. This action was sustained in Boston & Maine R. R. v. United States, 153 F. Supp. 952 (D.Mass.1957).

ognize a much higher percentage of railroad cost variability than the views of older times, see Locklin, Economics of Transportation (5th ed. 1960) 132, 152–154. The issue being debatable to say the least, we respect the Commission's judgment, New York v. United States, 331 U.S. 284, 328, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947).

The Central makes other criticisms, of lesser magnitude. It objects to the adjustment in column (4) as being based on facts outside the record, as allegedly giving double effect to the wage increase of November 1958, and as ignoring management efforts to counteract increased labor and material costs by greater efficiency. Moreover, it says that if this adjustment is permitted, the comparison should not be with the $3.92 rate proposed by the carriers but with the $4.03 to which this would have been raised by Increased Freight Rates, 1960, 311 I.C.C. 373 (1960). Furthermore, by the Commission's own statement, 314 I.C.C. at 174, the New York Central costs are too high by inclusion of an undetermined amount of "marine expenses".

■ Although these considerations are not without force, we find it unnecessary to deal with them. The Commission did not base its order on any finding that the proposed New York rates were not compensatory in the sense of covering long-term out-of-pocket costs. The Commission's present disapproval of the New York rates thus cannot be sustained on the basis on which its earlier disapproval of parity for Boston was upheld in Boston & Maine R. R. v. United States, 153 F.Supp. 952, 960 (D.Mass.1957). On the other hand, defendants are right that this does not settle the case against the Commission. "If the Commission's power to condemn rates as too low were confined to situations in which the rates did not cover out-of-pocket costs, its

power to control ruinous competition among railroads would be largely ineffective. Rate reduction, counterreductions by a competitor, and further cuts by the first carrier in retaliation could go on unchecked until the rates reached the level of out-of-pocket costs", Locklin, supra, at 311. Still, when rates cover long term out-of-pocket costs, a reviewing court may fairly require from the Commission some intelligible and factually supported statement of a ground, within the Commission's lawful power, why they should not be allowed to take effect. We return to the report, see fn. 7, to see whether it contained one.

■ In the paragraph following the discussion of costs the Commission makes the point that rate parity will help New York and hurt Baltimore. We are not certain whether this was intended simply as a preliminary to the following paragraph suggesting that, to prevent this, the Baltimore carriers would propose further reductions, an issue we will discuss below, or as a separate basis for decision. If the Commission intended the latter, it went beyond the authority confided to it. The Act does not vest the Commission with power to proscribe a reduced rate otherwise lawful under §§ 3 and 1(5) simply to prevent diversion resulting from competition; there was no finding that the New York rates constituted an "unfair or destructive competitive practice." [10] We do not read the Act as giving the Commission so general an umpiring role over the fate of cities as the quoted paragraph might be taken to assert; the Commission may prohibit a rate as too low only if the rate is too low from a transportation standpoint. Despite the 1935 amendment, the statement in the Texas & Pacific case remains valid: "The standards it [the Interstate Commerce Act] establishes are transportation standards, not criteria of

---

10. Since the Commission made no finding to this effect, we are not obliged to consider whether establishment by a higher cost carrier of a rate covering its long-term out-of-pocket but not its fully distributed costs, thereby forcing a lower cost carrier to reduce its rate, which was not higher than a reasonable maximum, might constitute an "unfair or destructive competitive practice". See New York, N. H. & H. R. Co. v. United States, supra, 199 F.Supp. at 641.

general welfare", 289 U.S. at 638, 53 S. Ct. at 772. See New York v. United States, 331 U.S. at 331–332, 67 S.Ct. 1207.

The report does not contain findings commonly made in support of a conclusion that a rate is too low. There are no "comparisons of going rates on the same commodity in the same or similar territories, * * * revenue per car, car-mile, and ton-mile, variations in traffic density, and peculiarities in transportation which affect transportation costs in general," which were relied on to sustain the Commission's order in Salt Cases of 1923, 92 I.C.C. 388, 410 (1924), aff'd sub nom. Jefferson Island Salt Mining Co. v. United States, 6 F.2d 315, 319 (N.D.Ohio 1925), see also Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L.Ed. 1553 (1935). Neither is there any finding, as there may have been in Equalization of Rates at North Atlantic Ports, 311 I.C.C. 689, 741 (1960), that the proposed reduced rates are "lower than necessary" to meet competition, see, e. g., Petroleum Between Washington, Oregon, Idaho, and Montana, 234 I.C.C. 609 (1939), aff'd sub nom. Scandrett v. United States, 32 F. Supp. 995 (D.Ore.1940), aff'd per curiam, 312 U.S. 661, 61 S.Ct. 736, 85 L.Ed. 1108 (1941); indeed, the record would forbid any such finding save perhaps for the Labrador ore, where the ocean costs may be less to New York than for the longer voyage to Philadelphia or Baltimore. Passing for the moment the discussion of a possible rate war, we find in the report no other criticism of the rates from a transportation standpoint unless it be in the remark, 314 I.C.C. at 164, "In the prior report we observed that iron ore

not only is of importance to the carriers in that it can and should reasonably bear its full share of the transportation burden, but that it is of vital importance to the national defense, and that the carriers should be permitted, within lawful bounds, to establish rates which will permit the movement of this traffic through several ports."

We do not doubt the power of the Commission, on proper findings, to proscribe as too low a rate which, although covering long term out-of-pocket costs, fails to meet fully distributed ones. Some traffic must pay for the "nonvariable" portion of operating expenses and property taxes and meet the deficits occasioned by traffic (such as the passenger business) that does not pay its way. If the Commission thinks a particular carrier should not haul particular traffic at a rate that will not contribute to such expenses, that is a judgment competent for the Commission to make. It is no answer that the individual carrier will be better off with the traffic than without it; the Commission must consider the entire transportation system and may, on a proper showing, utilize the minimum rate power to maximize profits for the system, as long as it does not require more than what would be a reasonable maximum rate. Such seems to be the lesson of Scandrett v. United States, supra, if that decision remains authoritative after the amendments made by the Transportation Act of 1940, 54 Stat. 912, and the Transportation Act of 1958, 72 Stat. 572.[11] We note also that in New York, N. H. & H. R. Co. v. United States, D.C., 199 F.Supp. 635 at 646, the injunction was only against the prohibition

---

11. We refer particularly to the 1940 amendment of § 15a(2) adding to the direction to the Commission to consider "the effect of rates on the movement of traffic" the words "by the carrier or carriers for which the rates are prescribed", and the portion of § 15a(3) added by the 1958 amendment, that "the Commission, in determining whether a rate is lower than a reasonable minimum rate, shall consider the facts and circumstanc-

es attending the movement of the traffic by the carrier or carriers to which the rate is applicable." Although the impetus for both these amendments stemmed from intermodal transport rivalries, the language is not thus limited. New York v. United States, 331 U.S. at 345–346, 67 S.Ct. 1207, may be read as implying that the authority of Scandrett was not impaired by the 1940 Act.

of rates that met fully distributed and not merely long run out-of-pocket costs.

However, we cannot regard the rather ambivalent reference to this general topic in the quoted sentence, even when we read it along with other portions of the report as we must, as a determination that this drastic power should be utilized. Indeed, one may doubt whether there were enough facts in the record to support such a determination had it been made. After nine years in the Commission and the courts, the record contains no study showing the costs of the Baltimore and Philadelphia carriers; indeed, we were told that the record, of 3149 pages of testimony and 318 exhibits, is altogether silent on the subject save for a half dozen sentences in the testimony of a traffic witness that the cost formula applicable to the eastern trunk-lines generally would produce per car costs from Baltimore $60.90 lower than the Erie's and $75.42 lower than the Central's from New York. Since the Commission does not mention this testimony, we cannot be sure it agreed with it. Neither does the report contain any estimates as to what the diversion from Baltimore and Philadelphia would be, taking account of the consignees' control of the traffic and of the New York carriers' lack of access to 8 of the 17 points in differential territory. Mr. Justice Cardozo's observation in United States v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 294 U.S. 499, 510, 55 S.Ct. 462, 79 L.Ed. 1023 (1935), is directly applicable. It is not enough that some suggestion of a reason should "lurk" in the Commission's report; a reviewing court cannot uphold an order on a ground which the Commission has not made sufficiently plain that the court can be sure the Commission meant to act upon it and had a factual basis for doing so.

This brings us to the ground principally relied on, 314 I.C.C. at 163–164, namely, the Commission's belief that a reduction by the New York carriers would lead to reductions by the Philadelphia and Baltimore carriers, with consequent lowering of the rate level to the prejudice of the latter and without benefit to the former. We shall state the contentions of the parties on this subject, although not all these turn out to have critical importance.

The New York interests suggest that the fear of a rate war is baseless, both because there is no sufficient showing that the Baltimore and Philadelphia carriers would engage in one and because the Commission could prevent this if they tried. The New York interests say there would be no rate war simply because the reduced New York rate became legally effective; the Baltimore and Philadelphia carriers would not cut their revenues so long as the new ore terminal was not yet built and the New York rate remained a paper rate. Furthermore, say the New York interests, no one can be sure the Baltimore and Philadelphia carriers would try to place reduced rates in effect even then. Management would consider how much of the traffic was to the 9 points served by the New York carriers, how much was to the 8 not served and how much of the traffic to the 9 would continue to move via Philadelphia and Baltimore even on a parity basis; rates would be reduced only if estimate showed that the profit on the added traffic the reductions would divert from New York would exceed the loss of revenue on the traffic that would be carried anyway. Moreover, say the New York interests, the Commission could prevent any such reduction if it wished, see United States v. Chicago, Milwaukee, St. Paul & Pacific R. Co., supra. They point to the history of the ex-lake grain rates from Buffalo, where although one of the Baltimore carriers had threatened to reduce its rates if parity were permitted, 99 F. Supp. at 405, the Commission later refused to allow this when the reduced rates to New York, Boston and Portland became effective as the result of an injunction, 292 I.C.C. 647 (1954).

The Baltimore and Philadelphia carriers respond that retaliatory rate reductions would surely occur. Pointing to the adverse effect already suffered by these ports from the opening of the St.

Lawrence Seaway, they say they will not let a ton of ore move through New York if they can help it. They refer to the Commission's conclusion, p. 164, "that the cost of service on this traffic from New York is substantially greater than that from Baltimore and Philadelphia", and the dissenting Commissioner's agreement, p. 170, with the majority's further statement that "the Baltimore and Philadelphia carriers can economically maintain lower minimum rates than the New York carriers on this traffic." They say that if the New York carriers can insist on being allowed to reduce rates to a level that covers long term out-of-pocket costs, they cannot be denied the same privilege. Whereas the New York carriers rely on the Milwaukee case, the Baltimore and Philadelphia interests point to Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 55 S.Ct. 822, 79 L.Ed. 1553 (1935).

■■■ The Milwaukee case is clear authority that the mere threat of a rate war is not enough to support a minimum rate order if the war be one the Commission ought prevent. On the other hand, if the Commission would not think it proper to prohibit a retaliatory reduction, either for lack of power or for lack of good reason, it may properly fix a minimum rate in the first instance in order to ward off developments that would simply result in reinstatement of existing differentials at a lower level. The Youngstown case was of that sort. The Commission had justifiably found both that the proposed rates were too low on general transportation standards and that they would disrupt a rate structure either fixed by the Commission or previously found by it to be just and reasonable, 197 I.C.C. 617 (1933), 295 U.S. at 480, 55 S.Ct. 822.

■■■ What gives concern about the Commission's report here is its failure to face up, and provide a direct answer, to this basic question of the lawful rate structure on imported iron ore among the three ports—a failure especially disturbing because of the contrary ruling in the prior report, 299 I.C.C. 195. That decision must be taken as finding not only that parity was then thought to constitute a reasonable rate structure but also that nothing else would be; the Commission not merely permitted the reduced New York rates to become effective but ordered retaliatory reductions cancelled, 299 I.C.C. at 209. Although the Commission was not bound to adhere to that decision, it is not putting the price of self-reversal too high if we ask that it tell us in unmistakable terms why a relationship, previously found to be not merely a lawful but the only lawful one, has now become either unlawful or at least not the only lawful one. It can, of course, be argued that the instant report must be read as saying that the Commission now would not think it proper to prevent a rate war by insisting on parity, in view of the indeterminately lower costs from Baltimore and Philadelphia; but we cannot be sure that the Commission ever made such a decision, especially since the cost relationship was no different in 1956 when the Commission used its minimum rate power to that very end. Just when one expects the Commission to address itself to this issue, the report goes into the fear about a rate war, without telling us why the Commission could not or would not choose to prevent one as it had previously done. Again Mr. Justice Cardozo's language in the Milwaukee case, 294 U.S. at 510–511, 55 S.Ct. at 467, fits this:

> "We would not be understood as saying that there do not lurk in this report phrases or sentences suggestive of a different meaning. * * * The difficulty is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency. * * * We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

There would seem to be three possible views about parity in the rates on imported iron ore among the three ports—that it is the only lawful relationship, the view the Commission took when the case was first before it; that it is unlawful; or that although parity is not unlawful, a differentially lower rate for Baltimore and Philadelphia could not properly be held to be. What is needed is that the Commission tell us which of these views it holds and, since it now appears to hold a different view from what it first did, why. Secretary of Agriculture v. United States, supra. Merely saying that a rate war is possible or probable is not a sufficient answer why; an adequately supported statement that the Commission would not feel able to prevent one would be.

Although we thus cannot affirm the Commission's order, equity does not demand or, indeed, now permit that we set it aside. No good would be accomplished by an injunction that would leave the Commission free to allow retaliatory reductions; yet we would have no warrant to issue one that would not. Even if we could assume that the new ore facility at New York would be constructed under such uncertainty, there is a danger of needless dissipation both of carrier revenues and private funds if this were to be built with the basic issue unresolved. The proper course thus is to hold the applications for an injunction pending a remand for further findings and conclusions by the Commission. It is unfortunate that this should be required in a case so long pending, especially when the final decision will hardly be ours; yet we think time will ultimately be saved by clarification now.

We do suggest that proceedings on the remand should not take anything like the three and a quarter years that elapsed between the previous remand on March 18, 1958, and the Commission's report of June 15, 1961. Apart from the generally harmful effect of leaden footed action, such a lapse of time between hearing and decision inevitably produces a stale record, like the one here before us.[12] While in no way would we circumscribe the Commission, the added evidentiary material needed appears rather limited—an updating of the cost studies of the New York carriers giving effect to the Commission's adjustments; similar cost studies for the Baltimore and Philadelphia carriers; comparisons of the yields of other similar traffic; current data as to ocean freight rates and costs on iron ore shipped to the various ports; national defense testimony, if anyone can produce really significant evidence on this subject; and recent information, giving effect to the opening of the St. Lawrence Seaway, as to the volume of import iron ore moving through Baltimore and Philadelphia, divided both as between points of origin and as between points of destination and, in the latter case, among the 9 points in differential territory where competition with New York would occur and the 8 where it would not. The case would appear appropriate for dispensing with a recommended decision, under § 8(a)(2) of the Administrative Procedure Act, 5 U.S.C. A. § 1007(a)(2). What is required most of all is a clear statement as to what the Commission does and does not regard as a lawful rate structure, and a reasoned explanation why, if it adheres to the result of the report here under review, it has reached a different conclusion than its previous one.

Accordingly we shall withhold action on the motions for an injunction pending a remand to the Commission, herein directed, for further proceedings consistent with this opinion. In the event of undue delay the plaintiffs may make a further application.

This is an order; no further settlement is required.

12. The record, made in 1958 and the first part of 1959, does not reflect the actual results of the opening of the St. Lawrence Seaway in 1959.